## NATIONAL LABOR RELATIONS BOARD
## v. BREZNER TANNING CO., Inc.
### No. 3948.

Circuit Court of Appeals, First Circuit.

Feb. 17, 1944.

LeRoy Marceau, Litigation Atty., of Washington, D. C. (Robert B. Watts, Gen. Counsel, and Howard Lichtenstein, Asst. Gen. Counsel, and Roman Beck and Leo J. Halloran, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Ralph M. Goldstein, of Boston, Mass., for respondent.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order of June 29, 1943, against Brezner Tan-

ning Co., Inc., of Concord, New Hampshire. 49 Stat. 449, 29 U.S.C.A. § 160(e).

The order is based on respondent's unfair labor practices, namely, anti-union statements, interrogation of respondent's employees concerning their union activities, and the discharge and refusal to re-employ Grace Messer because of her union membership and activity, all in violation of Sections 8(1) and 8(3) of the Act, 29 U.S.C.A. § 158(1, 3). It ordered respondent, its successors and assigns to cease and desist from its unfair labor practices, and to offer to Grace Messer full reinstatement and make her whole for loss of pay and to post appropriate notices.

The respondent, engaged in the manufacture, sale and distribution of finished leather, concedes that it is subject to the Act. It contends that there is no substantial evidence to support the findings of the Board and that its order is improper and invalid.

The International Fur and Leather Workers Union of the United States and Canada, Leather Workers Division, (C.I.O.) about July 1, 1942, set about on its campaign to unionize the employees of the respondent. Ernest Fletcher, a former employee of the respondent, appeared as a witness for the Board and testified that during that month while he and a group of about fifteen or sixteen other employees were eating dinner outside the mill and talking about the union, he heard a remark from behind: "If you know where you boys are well off you will keep out of it." He testified that there were only two persons, Poltak and Swartz, both foremen, on the platform behind him and one of them made the remark. Neither of these foremen was called as a witness before the trial examiner; one of them had left the respondent's employ. The trial examiner found that either Poltak or Swartz made this remark and that it referred to the union. Fletcher also testified that right after union meetings or when leaflets had been passed out, Melvin Snider, the president of the Company, would ask him "how the boys were making out with the Union" and the witness replied: "I guess they are making out all right". He also testified that Snider asked him if there had been a big crowd at the union meeting.

Alfred Corriveau was employed in the shipping room where George Nutting was the foreman. He testified that in October Nutting told him in the presence of a fellow employee that if the union came in some of them would probably get less pay.

Helen Spooner was also employed in the shipping room and had signed a card for membership in the union. She testified that Foreman Nutting questioned her about the attendance at a union meeting. She said that Nutting told her that another employee who had asked for a raise would not get it if the union came in. She said that he also told her that if the union came in they wouldn't be allowed to go from one machine to another when their own work slackened but would be sent home before they could go to another job.

Helen Perkins testified that she had worked in the shipping department and had been asked by Nutting: "Are you in for the Union?" and in answer said "Sure I am." He said: "Did you sign a yellow slip yet?" I said: "No". He said: "I have two of them up there. If you want to sign one of them you can. * * * If you get the Union in you will be put on piece work, and if you go as slow as you are now you will not make a day's pay. * * * Helen Spooner, for instance, is making good pay. If you had a union she wouldn't make as much as she is making now. I know she is in the union. In fact, I know who are the big people in the union. They think I don't know, but I do."

Clyde Fairbanks had been personnel manager until the latter part of September, 1942, and while he was still assisting in hiring help and recommending and approving applicants for employment, though he was then also engaged in production work, attended the union meeting on October 16th, which had been called to inform the employees "of the latest developments on the organizational drive". He left at once when told that he was a boss and that he had no right in there.

On October 13, 1942, Grace Messer, another shipping department employee, attended a union meeting at which she signed an application for membership in the union. The next day while at work she was asked by a fellow employee for a union application blank. She went to her cousin's pocketbook and took out a union application form, which was a 7" x 3-1/2" conspicuous yellow card. She testified that Nutting, who was her foreman, was watching her as she did this, although Nutting denied it. She gave it to the employee who requested it. The trial examiner found that Nutting witnessed the in-

cident and was familiar with the appearance of the card. She was discharged by Nutting two days later, on a Friday, although her work week did not terminate until Saturday, and although she was only on the third week of her four weeks' probationary period. She was told that she was merely being laid off for a while for lack of work. Nutting said to her: "I meant to tell you yesterday that I am laying you off for a while". Nutting maintained that he had warned her of her slowness. She testified that no such complaint had been made to her. Later, when she applied again for work, the president told her that if they needed any girls he would let her know, but thereafter inexperienced girls were hired to work in that department and she was never sent for. Before the trial examiner the reason given for her discharge by Nutting was that she was slow and incompetent. Nutting testified that Spooner had told him that Grace Messer was incompetent but the witness Spooner denied this. The trial examiner found Nutting to be a witness of "dubious credibility"; that he did not complain to Messer regarding her work; that Spooner did not speak to him about it; and that Messer was discharged because of her union membership and activity and that the respondent thereby discouraged membership in the union in contravention of the provisions of the Act. The Board adopted the above findings of the trial examiner.

█ Although conflicting inferences may be drawn from this evidence, we may not substitute our inferences for those of the Board. National Labor Relations Board v. Nevada Consolidated Copper Corp., 1942, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305.

█ On the cumulative effect of this evidence we cannot say that the Board was not warranted in finding that the respondent had violated Section 8(1) of the Act in that it interfered with, restrained or coerced employees in the exercise of their rights under the statute. The Board does not have to prove that the coercive conduct had its intended or desired effect. It is only necessary to show that the employer interfered, restrained, or coerced. Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 1943, 134 F.2d 240, 244, certiorari denied 1943, 64 S.Ct. 48; National Labor Relations Board v. John Engelhorn & Sons, 3 Cir., 1943, 134 F.2d 553, 556, 557; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 1942, 126 F. 2d 452, 457 certiorari denied 1942, 317 U. S. 650, 63 S.Ct. 45.

█ It was not necessary for the Board to show that the actions of the supervisory employees actually reflected respondent's policy: "The question is not one of legal liability of the employer in damages or for penalties on principles of agency or respondeat superior, but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes. To that extent we hold that the employer is within the reach of the Board's order to prevent any repetition of such activities and to remove the consequences of them upon the employees' right of self-organization, quite as much as if he had directed them." H. J. Heinz Co. v. National Labor Relations Board, 1941, 311 U.S. 514, 521, 61 S.Ct. 320, 323, 85 L.Ed. 309. It is enough that the employees had cause to believe that the foremen who committed the unfair labor practices were acting as representatives of the management. H. J. Heinz Co. v. National Labor Relations Board, supra; International Association of Machinists v. National Labor Relations Board, 1940, 311 U.S. 72, 61 S. Ct. 83, 85 L.Ed. 50.

█ Likewise we cannot say that the Board was not warranted in finding that Messer was discharged for union membership and activity. Cf. National Labor Relations Board v. Van Deusen, 2 Cir., 1943, 138 F.2d 893. There was evidence from which the Board could find that Nutting, her foreman who fired her, was opposed to the union; that he saw her furthering the cause of the union by securing a membership application card from one employee's pocketbook and giving it to another; that he knew what the application card looked like; that he summarily fired her without awaiting the end of the work week; and that inexperienced people were hired in the same department thereafter, although the president had promised to send for her when additional help was needed. As was pointed out by this court in National Labor Relations Board v. Abbott Worsted Mills, 1 Cir., 1942, 127 F.2d 438, 440, since the explanation of the discharge offered by the respondent did not stand up under scrutiny, that fact in itself strengthened the Board's inference drawn from the other facts. The Board found

that Messer's discharge did discourage membership in the union. As was said in National Labor Relations Board v. J. G. Boswell Co., 9 Cir., 1943, 136 F.2d 585, 596: "Such discrimination necessarily discourages union membership—at the very least that of the discharged employees—and therefore such discharge is ipso facto a violation of Section 8(3). Associated Press v. National Labor Relations Board, 301 U.S. 103, 129, 57 S.Ct. 650, 81 L.Ed. 953; National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 255, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S. Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 589, 598, 600, 603, 61 S.Ct. 358, 85 L.Ed. 368." Although National Labor Relations Board v. Air Associates, Inc., 2 Cir., 1941, 121 F.2d 586, followed in Stonewall Cotton Mills, Inc., v. National Labor Relations Board, 5 Cir., 1942, 129 F.2d 629, required that there be evidence showing that the employment discrimination had the effect as well as the purpose of discouraging union membership, the judge who wrote the opinion later narrowly limited it to its peculiar facts. National Labor Relations Board v. Cities Service Oil Co., 2 Cir., 1942, 129 F.2d 933, 937.

The order of petitioner running against "successors and assigns" is the usual form of order and has been approved by the Supreme Court. Southport Petroleum Co. v. National Labor Relations Board, 1942, 315 U.S. 100, 106, 107, 62 S. Ct. 452, 86 L.Ed. 718. Its justification is that it prevents evasion of the order by a change in ownership. The cease and desist order is proper since the violations therein restrained do "bear some resemblance to that which the employer has committed." National Labor Relations Board v. Express Publishing Co., 1941, 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930; National Labor Relations Board v. Reed & Prince Mfg. Co., 1 Cir., 1941, 118 F.2d 874, 890, 891 certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549. The order to offer Messer reinstatement and to make her whole for loss of pay was proper and may not be interfered with by this court despite her obtaining of equivalent employment elsewhere in view of the Board's finding that her reinstatement would "effectuate the policies of the Act." Phelps Dodge Corp. v. National Labor Relations

Board, 1941, 313 U.S. 177, 61 S.Ct. 845, 852, 85 L.Ed. 1271, 133 A.L.R. 1217; National Labor Relations Board v. Weirton Steel Co., 3 Cir., 1943, 135 F.2d 494, 498.

A decree will be entered enforcing the order of the Board.

MAGRUDER, Circuit Judge.

There was testimony that respondent's president, Snider, inquired of an employee, Fletcher, with whom he was friendly, "how the boys were making out with the union". I do not think that such a casual inquiry warrants the Board's inference that Snider interfered with the employees in violation of § 8(1). However, I agree that the cumulative effect of the other instances of interference, as testified to by the Board's witnesses, warranted a finding of an 8(1) violation.