285 F.2d 289
 CARPENTERS DISTRICT COUNCIL OF DETROIT, WAYNE, OAKLAND, MACOMB, SANILAC, ST. CLAIR AND MONROE COUNTIES AND VICINITY, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 15604.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 20, 1960.
 Decided December 8, 1960.
 
 Mr. Rolland R. O'Hare, of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, Detroit, Mich., for petitioner.
 Mr. Bernard Dunau, Washington, D. C., was on the brief for petitioner.
 Miss Vivian Asplund, Atty., N. L. R. B., with whom Messrs. Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.
 Mr. James C. Paras, Atty., N. L. R. B., also entered an appearance for respondent.
 Before WILBUR K. MILLER, Chief Judge, and BAZELON and BURGER, Circuit Judges.
 BURGER, Circuit Judge.
 
 
 1
 The petitioner asks us to set aside and the respondent asks us to enforce an order of the National Labor Relations Board which rested on findings that petitioner violated Sections 8(b) (2) and 8(b) (1) (A) of the National Labor Relations Act as amended, 29 U.S.C.A. § 158 (b) (1) (A), (2), by causing employers to discriminate unlawfully in hiring practices. We have jurisdiction under Sections 10(e) and (f) of the Act.
 
 
 2
 The Board's order requires petitioner to cease and desist from causing or attempting to cause the employer, W. J. C. Kaufman Company, or any other employer, to discriminate against employees or applicants for employment by requiring them to obtain work permits, clearances or job referrals from petitioner as a condition of employment or from in any like or related manner restraining or coercing employees or prospective employees of Kaufman Company or any other employer in the exercise of rights under Section 7 of the Act. Additionally, petitioner is required to make restitution to a particular job applicant, one Bissonnette, for loss of wages because of unlawful discrimination against him, and to post specified notices.
 
 
 3
 Bissonnette, who was a member of Local 1373 of the United Brotherhood of Carpenters and Joiners, a local not affiliated with petitioner District Council, applied for employment on a job site where the Kaufman Company was engaged in a construction project. Harrison, a foreman who had hiring authority, told Bissonnette that he had a job for him. Harrison, although a foreman, was a member of a carpenters' local affiliated with the petitioner. The record shows that Bissonnette from past experience as a union member believed that a work permit was required. When Bissonnette expressed his understanding that he needed a work permit from petitioner before going to work, Harrison gave him until noon to obtain a permit and sent him to Rogers, the union steward on the job site. Bissonnette's testimony was, "He [Harrison] said that I should get a permit and be back here by noon and he would put me to work at noon." The union steward, who is an elected official of petitioner's local, then told Bissonnette he could get his work permit at the local union office in Mt. Clemens. The constitution of the carpenters' union and the working rules of the District Council, petitioner here, require that a member of an unaffiliated, i. e., a "foreign" local obtain a work permit in order to work in petitioner's jurisdiction. Prior to this episode however, petitioner had instructed its members in union meetings not to apply these rules so as to discriminate in employment against members of non-affiliated locals. That suspension of the constitution was not known to Bissonnette when he applied or to Harrison when he acted on the job application. No evidence is shown that petitioner communicated its suspension of enforcement of these provisions to its members except at union meetings.
 
 
 4
 Bissonnette, acting on the information of the union steward as to where permits were issued, went to the local union office in Mt. Clemens as directed. He testified that he was told they "couldn't issue no permits there. It was too near the district council," and that he "would have to go into Detroit to the District Council." Following these directions, he went to Detroit where he was told that "they weren't issuing any permits. That the Carpenters were on strike," and that "there is too many men out of work here" and "it would look bad if he issued me a permit * * *." Bissonnette then returned to the job site and reported to Harrison that he could not get a work permit and understood he could not go to work without it. Harrison, according to Bissonnette's testimony, said he "was sorry" and there was "nothing he could do about it." When asked whether he felt that Bissonnette needed a permit, Harrison answered, "Yes, I didn't say so. It wasn't necessary for me to specify that he did. * * *" Harrison also testified that "to the best of [his] knowledge" he followed the working rules and the union constitution.[1] He also acknowledged that he worked "in conjunction with the steward in an effort to uphold the trade rules."
 
 
 5
 It was against this background the Trial Examiner found that the petitioner had violated Section 8(b) (2) of the Act through Harrison's exercise of his hiring authority in accordance with the union constitution and working rules. He found that in the context of their common understanding of the union constitution, the implication of the conversations between Harrison and Bissonnette must have been that Bissonnette was not eligible for employment without a permit. He also found that the petitioner was responsible because its working rules imposed a duty on Harrison as a foreman to uphold these rules. However, he found that so far as the proof went the Bissonnette episode was "an isolated and accidental application" of petitioner's rules by Harrison. The Examiner seems to have accepted petitioner's claim that its members had been instructed at union meetings not to apply rules so as to cause discrimination, but he found that this did not relieve petitioner of responsibility for Harrison's conduct since "he was acting within the scope of his apparent authority under the Working Rules. * *"
 
 
 6
 The Board found that Harrison's action relating to Bissonnette "fell within the contemplated scope of the authority and responsibility" placed on him by petitioner and that petitioner had failed to communicate to Harrison the policy of suspending the enforcement of the constitution which modified his actual authority. In these circumstances, the Board held, Harrison "thus remained cloaked with apparent authority, if not actual authority, to act on behalf * * *" of petitioner.
 
 The questions presented to us are:
 
 7
 (a) Was Bissonnette refused employment because he did not have a work permit?
 
 
 8
 (b) If so, was petitioner responsible for this discrimination? (c) Is the scope of the Board's order too broad in view of the findings and evidence?
 
 
 9
 (1).
 
 
 10
 Section 8(b) (2) of the Act as amended makes it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3)" which in turn declares it an unfair labor practice for an employer "by discrimination in regard to hire * * * to encourage or discourage membership in any labor organization."
 
 
 11
 In National Labor Relations Board v. International Bhd. of Boilermakers, 2 Cir., 232 F.2d 393, certiorari denied 1956, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118, the court held it was a violation of Sections 8(b) (2) and (1) (A) of the Act for a union to cause four union members to be refused employment because they were not members of the particular local union which had jurisdiction over the job site. Judge Lumbard's concurring opinion, in which Judge Waterman joined sustaining the Board finding of violation of the statute, discloses the similarity of the facts to those presented in the instant case:
 
 
 12
 "Hagan [company foreman] told Smith and Marin that since they were Lodge 23 members and did not have Building Trades Quarterly cards they would have to get the approval of District 2 headquarters. At 14th Street headquarters field representative Graber told them that the Astoria jobs were being held for District 2 members." 232 F.2d at page 396.
 
 
 13
 See also National Labor Relations Board v. Local 542, Int'l Union of Operating Engineers, 3 Cir., 1958, 255 F.2d 703.
 
 
 14
 The petitioner urges that the facts do not show Bissonnette was refused employment but on the contrary that his loyalty to union principles led him to pass up the job tender of his own volition rather than violate an internal union rule. This is a strained and strange interpretation of the evidence before the Examiner and the Board. Bissonnette applied for a job and was assured a job subject only to securing a work permit which he erroneously assumed was indispensable. Harrison sent Bissonnette to the steward; the steward, Rogers, told him to go to the Mt. Clemens office of the union; the Mt. Clemens office sent him into Detroit. At each point Bissonnette was frustrated and "bucked" to the next by the very union officers who were looked upon by him as people who were supposed to help him get work. It is not surprising that he was pushed to say, finally, that he might as well "tear up" his union credentials.
 
 
 15
 The suggestion that the union sought only and narrowly to appeal to the loyalty and conscience of each union member to comply with work permit provisions is tenuous at best. The unsophisticated working carpenter could hardly be expected to discern this subtle distinction. No reason appears why we should not accept the Trial Examiner's evaluaton just as the Board did. The whole record abundantly supports the finding that union representatives acting for petitioner conveyed to Bissonnette the "message" that no work permit meant no work, and this was consistent with the "message" which Harrison by acts and utterances in his first, as in his final conversation, conveyed to Bissonnette. See National Labor Relations Board v. Cement Masons, 9 Cir., 1955, 225 F.2d 168.
 
 
 16
 (2).
 
 
 17
 The Board held petitioner responsible for Harrison's conduct on the ground that the constitution and the working rules imposed responsibility for rules enforcement on the foreman, who was required to be a member of the union. There is nothing ambiguous or equivocal about the Board's finding on the issue of responsibility; nor does it lose any of its vitality by reason of subsequent expressions of the Board on the same general subject. Our dissenting colleague relies on the Board's statement that Harrison "remained cloaked with apparent authority, if not actual authority" disregarding the earlier finding that Harrison's conduct "fell within the contemplated scope of the authority" placed on him by petitioner. Thus we do not go beyond the limits permitted by Securities and Exchange Comm'n v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626, in sustaining the Board's action.
 
 
 18
 It is conceded by the union that the constitution and rules contained the provisions, which if superimposed on the hiring authority, constituted a violation of Sections 8(b) (2) and (1) (A). Cf. National Labor Relations Board v. Millwrights' Local 2232, 5 Cir., 1960, 277 F.2d 217 petition for certiorari filed, 29 U.S.L. Week 3048 (U.S. July 11, 1960) (No. 229). There is no evidence of any kind that any limitation or suspension of the constitution and rules was communicated to Harrison and there is persuasive evidence from his utterances and acts that he was not aware of any limitation.
 
 
 19
 Uncommunicated union limitations on the scope of working rules do not operate to limit a foreman's authority or the union's responsibility. National Labor Relations Board v. Cement Masons, supra.
 
 
 20
 The case of Carpenters District Council of Milwaukee County and Vicinity of United Broth. of Carpenters and Joiners of America, A.F.L.-C.I.O. v. National Labor Relations Board, 1959, 107 U.S.App. D.C. 55, 274 F.2d 564, relied on by the petitioner, does not aid its position. There the majority held that absent evidence to the contrary, the foreman was presumed to act on behalf of the employer. Here the authority exercised by the foreman was obviously on behalf of the employer since it was hiring authority, but it was exercised under the dictates of the petitioner's constitution and working rules. The foreman exercised this hiring authority, not according to instructions from the employer but according to commands of the union constitution. No suggestion is made that the employer had a policy of hiring only union members or that he required work permits.
 
 
 21
 Viewing the record as a whole there is ample evidence to support a finding that petitioner was responsible for the actual enforcement by Harrison, as foreman, of the union constitution and working rules so as to deprive Bissonnette of employment.
 
 
 22
 (3).
 
 
 23
 The order is attacked by petitioner on the ground that it applies not only to the Kaufman Company but to "any other employer" and to practices committed in "any like or related manner." In light of the Examiner's finding that the Harrison-Bissonnette episode "at most, is proof only of an isolated and accidental application" of the constitution and working rules, the scope of the Board's order is difficult to understand.[2] National Labor Relations Board v. Express Publishing Co., 1941, 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930, tells us that "the authority conferred on the Board to restrain the practice which it has found * * * to have [been] committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued or persuasively to be related to the proven unlawful conduct."
 
 
 24
 However, it appears that no objection to the scope of the order was made before the Board. Exception was taken to the recommended order "insofar as * * * based on materials previously excepted to." But these exceptions all related to findings on discrimination and agency. There were no findings as to the scope of the order; only the terms of the order describe its scope. Thus the exception taken "did not apprise the Board that petitioner intended to press the question now presented." Marshall Field & Co. v. National Labor Relations Board, 1943, 318 U.S. 253, 255, 63 S.Ct. 585, 586, 87 L.Ed. 744.
 
 
 25
 Petitioner argues that even absent objection before the Board this court now has power to modify the order in this respect. We think not. Several circuits seem to have held the reviewing court may so act because the enforcement order is the order of the court, not the order of the Board. See National Labor Relations Board v. Local 111, United Bhd. of Carpenters, 1 Cir., 1960, 278 F.2d 823; National Labor Relations Board v. Brandman Iron Co., 6 Cir., 1960, 281 F.2d 797. The Sixth Circuit appears to have relied upon Mr. Justice Stone's concurring opinion in National Labor Relations Board v. Cheney California Lumber Co., 1946, 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739. Circuit Judge Cecil dissenting in the Brandman case relies on the majority view in the Cheney case and his premise would seem to be correct. This is also the view of the Second Circuit. National Labor Relations Board v. Combined Century Theatres, Inc., 2 Cir., 278 F.2d 306.
 
 
 26
 In National Labor Relations Board v. District 50, UMW, 1958, 355 U.S. 453, 78 S.Ct. 386, 2 L.Ed.2d 401, the Supreme Court set aside the action of this Circuit which modified a Board order by changing the wording of a notice, saying that no "extraordinary circumstances" were shown to bring the case within the exceptions allowed under the controlling statute defining the scope of review. See also Federal Power Commission v. Colorado Interstate Gas Co., 1955, 348 U.S. 492, 497-501, 75 S.Ct. 467, 99 L.Ed. 583. Petitioner neither claims nor describes any extraordinary circumstances which would appear to warrant our now modifying the scope of what might seem to be an order which goes beyond the needs of the case. We do not read Express Publishing or similar cases in the Supreme Court as do the First and Sixth Circuits. We read those cases as precluding modification of the order by us unless the party challenging the order shows that he is within the exception of the rule; appellant has not done so. The order of the Board will be enforced.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 "Q. I ask you if this is the by-laws and working rules which you indicate you abide by? A. Those are the working rules I work by, yes
 "Q. And the constitution, General Counsel's Exhibit Number 3, is that the constitution which you abide by? A. We operate by the constitution." (Emphasis added.)
 
 
 [2]
 Petitioner's failure to raise this point to the Board is similarly puzzling. The Intermediate Report plainly put petitioner on notice with respect to the scope of the recommended order, and the Board adopted the recommendation
 
 
 
 28
 BAZELON, Circuit Judge (dissenting).
 
 
 29
 I agree that there is substantial evidence that foreman Harrison refused to hire Bissonnette because he had not obtained a work permit. I also agree that foremen who are union members are authorized to enforce the District Council's working rules.[1] But I do not think that the present record and the Board's findings sustain the Board's conclusion that the District Council was responsible for Harrison's conduct. Nor do I think that the equivocal "finding" that Harrison was never informed of the restriction of his authority, upon which the majority primarily relies to sustain the Board, was asserted by the Board as one of its grounds for decision.
 
 
 30
 The standards for vicarious responsibility under the Labor Management Relations Act[2] are the common-law principles of agency. International Ladies' Garment Workers' Union v. National Labor Relations Board, 1956, 99 U.S.App.D.C. 64, 237 F.2d 545. Consequently, unless Harrison's conduct fell within the scope of either his actual or his apparent authority to enforce the work rules of the Council, his conduct cannot be imputed to the labor organization.
 
 
 31
 The Board's opinion expresses two grounds for its conclusions that the Council was responsible for Harrison's conduct. In the first instance, the Board relies on the Council's written work rule and upon the provision of the United Brotherhood's constitution which requires union members from other jurisdictions to secure work permits from the Council as a condition precedent to employment within the Council's territorial jurisdiction. This rule, according to the Board, when coupled with the authority of foremen to enforce work rules, conferred upon Harrison the actual authority to refuse Bissonnette employment because he did not have the requisite permit.
 
 
 32
 The Council has contended throughout the proceedings that, although this invalid work rule is on its books, it has not been enforced, and that this nullification and abandonment was communicated to the Council's membership. The Board's opinion answers this contention by concluding that, even if Harrison lacked actual authority, he had, in the circumstances of this case, apparent authority to enforce the invalid rule. The Board found that, even if the Council had abandoned the enforcement of the rule, this abandonment was never communicated to Bissonnette, and, therefore, Harrison remained clothed with the apparent authority to enforce the rule vis-a-vis Bissonnette. Of course, the Board's order can be sustained only if its findings are supported by substantial evidence viewing the record as a whole and if the conclusions from them are correct as a matter of law.
 
 
 33
 The Board's initial finding that Harrison, solely by virtue of the written rule requiring members of foreign locals to obtain work permits, had actual authority to refuse Bissonnette employment is not supported by the record. The trial examiner believed the Council's job steward's testimony that the invalid rule was not being enforced and the business agent's testimony that the rule had not been applied for a period of two years. In light of this uncontradicted testimony, I do not think the Board's contrary and unsupported finding that the rule requiring permits was in effect at the time of the Bissonnette episode can be considered as "supported by substantial evidence on the record considered as a whole * *." Labor Management Relations Act § 10(e), 61 Stat. 146 (1947), as amended, 29 U.S.C.A. § 160(e); Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.
 
 
 34
 The Board alternatively urges that, even if Harrison were without actual authority, because of the revocation of the rule requiring permits, he had apparent authority vis-a-vis Bissonnette because Bissonnette was not informed of this revocation. For the doctrine of apparent authority to be operative, it is essential that there be a holding out by the purported principal that his agent is authorized to act on his behalf, and this holding out must be relied upon by the person dealing with the apparently authorized agent.[3] The Board based its conclusion of apparent authority solely upon its finding that the restriction on Harrison's authority was never communicated to Bissonnette. But the Board did not find that Bissonnette relied upon any holding out by the Council that Harrison was authorized to require work permits of prospective employees. Admittedly, if Bissonnette had been familiar with the Council's rules as written, he would have been entitled to rely on the authorization to foremen who were union members to require work permits. Bissonnette testified, however, that he had no knowledge of the Council's rules. His understanding that a work permit was required as a condition precedent to employment was based, not upon any holding out by the Council, but upon his job experiences in other parts of the country.
 
 
 35
 The majority opinion does not place primary reliance upon either of these grounds in affirming the Board's order. Rather, it states that the Board found that the Council failed to communicate to Harrison the policy of abandoning the enforcement of the invalid work rule which limited his actual authority. This, of course, could have been a proper ground for decision by the Board. Absent such communication, Harrison would have retained actual authority to enforce the rule.[4] But I cannot read the Board's opinion as relying on this ground.
 
 
 36
 The Board's opinion does suggest, in a parenthetical footnote reference, that the abandonment of the particular work rule and consequent restriction of authority was never communicated to Harrison, or, if it were communicated to Harrison, he had forgotten about it.[5] Even if this equivocal and imperfectly articulated statement of the Board, based upon ambiguous testimony,[6] be considered a finding that the abandonment of the rule had never been communicated to Harrison, as my colleagues apparently do consider it, it seems to me to be unmistakable from the context of the Board's opinion that this "finding" was not a basis for the Board's decision.[7] The Board's opinion states:
 
 
 37
 "Whatever may be the restriction that was intended to be placed upon Harrison's authority and duty under the Constitution and Working Rules, it is sufficient that it was never communicated to Bissonnette. Harrison thus remained cloaked with apparent authority, if not actual authority, to act on behalf of the Respondent and the uncommunicated restriction on this authority cannot serve to relieve the Respondent of its responsibility for Harrison's conduct."[8]
 
 
 38
 In light of this express ground for decision which is the Board's sole answer to the Council's contention that the invalid rule was abrogated, I do not think that we can raise what is at best an equivocal finding to the status of an alternative ground for decision. The Board's order must be judged exclusively on those grounds upon which the record shows it was based. Securities and Exchange Comm'n v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626.
 
 
 39
 Even though the Council's business agent testified that the abandonment of the work rules was communicated to the members and his testimony was accepted as credible by the trial examiner, it may be that for some reason this restriction was never manifested to Harrison. Similarly, it may be that the conduct of the Council's representatives at its offices — in refusing Bissonnette a permit because a substantial number of the Council's members were out of work — constituted a holding out that Harrison had authority to enforce the invalid work rule. Bissonnette may have relied upon this during his second encounter with Harrison. The Board, however, did not make these findings, and an appellate court cannot supply them. Securities and Exchange Comm'n v. Chenery Corp., supra. I think, however, that if evidence is available on either of these matters, the Board should have the opportunity to present it in further proceedings and to determine the question of responsibility in light of the findings which may result. Carpenters District Council of Milwaukee County and Vicinity of United Broth. of Carpenters and Joiners of America, A.F.L.-C.I.O. v. National Labor Relations Board, 1959, 107 U.S.App.D.C. 55, 274 F.2d 564. I would therefore set aside the Board's order and remand the case for supplementary proceedings as the Board may determine.
 
 
 
 Notes:
 
 
 [1]
 Section 23(E) of the District Council's By-Laws and Working Rules provides: "It shall be the duty of every General Foreman and Foreman to work in conjunction with the Steward in an effort to uphold the trade rules, and the General Foreman and Foreman will be held equally responsible with the Steward for the violation of any trade rules."
 
 
 [2]
 61 Stat. 136 (1947), 29 U.S.C.A. § 151 et seq
 
 
 [3]
 See Nelson v. New Hampshire Fire Ins. Co., 9 Cir., 1959, 263 F.2d 586; Perper v. Sonnabend, 5 Cir., 1955, 221 F.2d 142; Berryhill v. Ellett, 10 Cir., 1933, 64 F.2d 253; 1 Restatement (Second), Agency § 27 Comment A (1958)
 
 
 [4]
 1 Mechem, Agency § 624 (1914); 1 Restatement (Second), Agency § 119 (1948)
 
 
 [5]
 Carpenters District Council of Detroit, 45 L.R.R.M. 1134, 1135 n. 2 (1959). This footnote reads:
 "Harrison himself did not appear to have any knowledge of any limitation on his authority and duty to enforce the Rules. He testified:
 "`Q. You knew he [Bissonnette] needed a permit didn't you? A. I knew according to our rules if I belonged to the Brotherhood I expect to live up to the rules and what not, and I feel that same applies to him. If he belongs to the Brotherhood he expects to live up to the rules.
 "`Q. And one of the rules is that in circumstances in which Mr. Bissonnette found himself he needed a permit to work on the job? A. He felt he needed a permit to work.
 "`Q. And you felt he needed a permit? A. Yes, I didn't say so. It wasn't necessary for me to specify that he did. * * *'"
 
 
 [6]
 See testimony referred to in note 5 supra
 
 
 [7]
 It should be noted that the trial examiner was unable to find any actual authorization from the Council for Harrison's conduct, but relied exclusively on a finding of apparent authority in holding the Council responsible for the foreman's acts
 
 
 [8]
 Carpenters District Council of Detroit, 45 L.R.R.M. 1134, 1135 (1959), emphasis supplied