NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

NEW ENGLAND TANK INDUSTRIES,
INC., Respondent.

No. 5920.

United States Court of Appeals
First Circuit.

April 27, 1962.

**274**

Samuel M. Singer, Atty., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Joseph C. Thackery, Atty., Washington, D. C., were on brief, for petitioner.

George H. Foley, Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on the brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended, (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq.), for enforcement of its order issued against the respondent, New England Tank Industries, Inc., for alleged unfair labor practices occurring on a government owned gasoline pipeline between Searsport and Limestone, Maine, which respondent operates and protects.

In agreement with the Trial Examiner, the Board found that respondent unlawfully refused to employ or reemploy forty-nine employees of its predecessor operator on the pipeline—the F. H. McGraw Company—because they were members of one of the two charging unions.[1] The Board also found that respondent unlawfully refused to reinstate three additional employees who had accepted employment but who then struck in protest against respondent's refusal to employ the forty-nine employees.

Respondent, a Massachusetts corporation, with affiliates in New Hampshire, Pennsylvania, California and South Carolina, operates pipelines and petroleum tank farms in connection with the transportation of aviation fuel and related products. In August, 1960 as a result of respondent's bid, it was successful in obtaining the contract for the operation of a two hundred mile long pipeline between Searsport and Limestone, Maine. This government owned facility was used to supply jet fuel and related gasoline products to two Air Force bases in Maine.

The contract for the operation and protection of the pipeline is negotiated on a year-to-year basis. During the contract year October 1, 1959 to September 30, 1960, the pipeline was operated by the F. H. McGraw Company. McGraw had in its employ all of the employees involved here, many of whom had either worked continuously on the pipeline since it was first established in 1953 or had several years of employment experience on the operation. The two unions involved in the present action had first won recognition as agents for the pipeline employees in 1958.

When the McGraw contract ended and the respondent assumed responsibility for the operation and protection of the pipeline, all but three [2] of the former McGraw employees had been refused reemploy-

---

1. Independent Union of Plant Protection Employees in the Electrical and Machine Industry; and Oil, Chemical & Atomic Workers, International Union, AFL–CIO, Local 14–366.

2. Their special status will be discussed *infra.*

ment by the respondent. The reason why these employees were denied employment poses the principal issue in this case. The charging unions contend and the Board so found that the former workers were denied employment for reasons relating to their union membership and activities, and that, consequently, respondent violated Sections 8(a) (1) and (3) by refusing to employ them. The respondent, on the other hand, contends that its decision not to hire the vast majority of the McGraw employees stemmed from a pattern of unexplained gasoline losses which had occurred on the pipeline in the months preceding the expiration of the McGraw contract. It argues that the extent of these losses could be attributed only to mismanagement or pilferage. In the attempt to remedy this situation, respondent maintains that it decided to proceed with an entirely new crew.

■ We must determine whether or not substantial evidence supports the Board's conclusion that the respondent's actions were primarily motivated by an anti-union *animus* for it is well settled that an employer who discriminates against applicants for employment because of their union membership or activities violates Section 8(a) (3) and (1) of the Act. See, Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 182–187, 61 S.Ct. 845, 85 L.Ed. 1272 (1941); Piasecki Aircraft Corporation v. N. L. R. B., 280 F.2d 575, 583–584 (3 Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961); National Labor Relations Bd. v. Lamar Creamery Co., 246 F.2d 8, 10 (5 Cir.

1957); National Labor Rel. Bd. v. Textile Machine Works, 214 F.2d 929, 932 (3 Cir. 1954).

■ The principal evidence supporting the Board's finding was supplied by testimony of several of the former employees and by a certain John Hayes, a quality control inspector at the Loring Air Force base in Maine. All of these witnesses testified to certain colloquies which each had with the respondent's assistant superintendent, Gordon V. Atwater, concerning respondent's hiring policies.[3]

The first of the former employees to testify at the hearing was Gregory Roix. He testified that after asking Atwater whether the former employees would be rehired, Atwater told him that the "Company [had] bid so low they couldn't afford to pay the union wages." Roix also testified that Atwater had adverted to the fuel losses but had concluded the conversation by stating "that after September 30 that there would be no union on the pipeline because the company was against unions."

Raymond Edgecomb, another McGraw employee, related a conversation which he had with Atwater in the latter's office. "Q. All right. Will you tell the Trial Examiner what Mr. Atwater said to you and what you said to him? A. Mr. Atwater told us that we wasn't to be rehired. I asked him why. He said the new company had taken the bid so low that they couldn't pay the union wage, and they wanted to break the union; and he said they was going to. The excuse

3. At oral argument respondent raised the question of whether Atwater's statements could be properly attributed to the Company as reflecting management policy. In short, was he a "speaking agent" whose authority was such that his statements could be attributed to his principal. Cf. Restatement of Agency 2d, § 288. We believe that this question must be answered in the affirmative. Atwater was the assistant superintendent of the entire pipeline operation. Though respondent in its answer to the Board's complaint denied that Atwater had any authority to hire, it admitted that he had authority to recommend the disciplining of employees and to recommend the adjustment of grievances and to that extent could be deemed a "supervisor" within the meaning of Section 2(11) of the Act. Moreover, Erwin, the respondent's superintendent, testified that at the time he hired Atwater he discussed the Company's hiring policy with him. Most significantly, Erwin testified that he expressly delegated the authority to hire to Atwater. Consequently, we believe that there is ample evidence to show that Atwater's statements could be validly attributed to respondent as bespeaking company policy.

they was using was the excessive loss of gas."

Steward Stockford, another witness for the Board, testified to a conversation which he had with Atwater in the presence of Hayes and Edgecomb. "Q. Will you tell the Trial Examiner what was said at this time and by whom? A. Well, Mr. Atwater said that we were not going to be rehired by the new contractor, and he said they were going to hire all new men, that they didn't want any union men there, that they were going to try to break the union."

■■■ John Hayes, the Air Force quality control inspector, testified that Atwater had originally told him that he "planned on rehiring all of the present employees if [he] would be allowed by the new contractor." Thereafter, Hayes was told by Atwater that the reason that he wasn't permitted to hire the former McGraw employees was "Because they were members of the Union and were on union scale." Hayes also testified that he was told by William Erwin, the respondent's superintendent, that "this [the pipeline operation] was going to be a non-union shop on the first of October." [4] (The date on which respondent succeeded the McGraw Company).

As noted previously, it was the respondent's position that its decision not to hire the former employees was based solely on the fact of the gasoline losses which had occurred on the pipeline during the McGraw management.

Relative to this defense, the record indicates that respondent had received some information of a general nature that losses had occurred during the McGraw operation. However, as the Board pointed out, "Not until after the respondent had openly made it clear that none of the employees on McGraw's payroll would be hired by it, did it come into possession of actual figures of so-called 'losses'".

More significantly, two government inspectors who testified on this point, stated that losses were in fact "normal" and were reasonably to be anticipated as a result of the influence of variations in temperatures, evaporation and tank cleaning and mixing. Moreover, the record is barren of any evidence that the government itself raised any question as to the "losses" or that McGraw was in any way penalized for them. The government inspector testified that none of the losses were regarded as unacceptable at the central records-keeping depot of the Air Force at Middletown, Pennsylvania. Finally, Superintendent Erwin admitted that he was fully aware that all reports of losses submitted during McGraw's operation of the pipeline had been approved by the Air Force.

■■■ With the evidence thus in equipoise, we cannot say that the Board's findings that respondent discriminatorily refused to hire the former McGraw employees lack substantial evidence. National Labor Relations Board v. Walton Manufacturing Company, and Loganville Pants Company; National Labor Relations Board v. Florida Citrus Canners Cooperative, 82 S.Ct. 853. Respondent admitted that it was "normal procedure" both for the preceding contractors operating the pipeline at issue, and for itself at its other operations, to retain the personnel of the prior contractor. Despite the presence of a pool of experienced workers, respondent went to considerable length to replace the union employees with entirely new workers—most of whom had no previous experience on pipeline operations. Indeed, to train the new workers, respondent transported some employees from as far away as its Californian operations. Finally, we note that all of respondent's far flung affiliates function as "non-union" operations. Taken in context, we believe that it can

4. We recognize that, by itself, this remark could scarcely be held to be invidious or violative of the Act. It is, at worst, an ambiguous statement whose coherence can only be supplied by the context of other facts and circumstances. The respondent would be within its rights to use all *lawful means* to render the pipeline a non-union operation. Whether its activities were so circumscribed is the question.

be fairly said that if not the only reason, the substantial or motivating reason for the respondent's refusal to hire the former employees resided in the fact that the employees were members of the union. As such the respondent's action clearly violates Section 8(a) (3) and (1) of the Act. National Labor Relations Bd. v. Whitin Machine Works, 204 F.2d 883 (1 Cir. 1953).

 Both the Trial Examiner and the Board found that the above cited statements of Atwater were attempts to intimidate the applicants in the exercise of their statutory rights and that these statements constituted a separate violation of Section 8(a)(1) of the Act. We believe that, on their face, such statements could well be found to constitute interference, restraint and coercion with union activity within the meaning of Section 8(a) (1) of the Act and that substantial evidence supports the Board's findings in this regard. See National Labor Rel. Bd. v. Saxe-Glassman Shoe Corp., 201 F.2d 238, 242 (1 Cir. 1953); National Labor Relations Board v. Brezner Tanning Co., 141 F.2d 62, 64 (1 Cir. 1944).

The respondent did offer employment to three of the former employees, Elwood Webster, Stanley Sarnacki and Gregory Roix. The offers were made to these men while the McGraw contract was still in force. Each of the men accepted the offer. While there were some indications that the respondent was going to proceed with an essentially non-union crew, the record indicates that the situation in this regard was still fluid at the time that the offers were tendered and accepted. Thereafter, on September 30, the final day of the McGraw contract, a union organizer called Roix and told him that it was now obvious that the three men were to be the only employees who would be hired by the respondent. This call, though apparently devoid of coercion, made it clear that the three men would have to make a decision and either cast their lot with the respondent or stick with their fellow union members. The three chose the latter and communicated

their decision not to report for work to the respondent, making clear, at least by implication, that their reason for declining employment was the respondent's policy *vis a vis* the other employees. The record indicates that respondent understood why these individuals were withholding their services.

On these facts a majority of the Board found that the men had accepted respondent's offer of employment and, subsequently, had only withheld their services in protest over respondent's refusal to employ their co-workers. Consequently, under the Board's view "the three employees became unfair labor practice strikers entitled to immediate employment upon their unconditional offer to abandon the strike."

Respondent resists this finding on the basis that the men had never actually effectuated an employer-employee relationship with the company and therefore could not "strike" against it.

 Under the facts of the instant case, we cannot accept respondent's position. It is well settled that the terms "mutual aid" and "concerted activities" as used in Section 7 of the Act "include, we think, the right to join other workers in quitting work in protest over the treatment of a co-employee, or supporting him in any other grievance connected with his work or his employer's conduct." Carter Carburetor Corp. v. National Labor Relations Board, 140 F.2d 714, 718 (8 Cir. 1944).

It is true that these men never actually reported to work for respondent. However, it is equally true that but for the company's illicit policies and acts they would have done so incident to their antecedent agreements. Moreover, as the Board pointed out in its footnote 1 to its decision and order "These three workers were not strangers to respondent's operations * * * They were, at the time of respondent's unfair labor practices, performing precisely the same jobs for the previous pipeline operator. They had applied for continued employment with respondent, and their decision to join the

strike came only after respondent had accepted their applications and invited them to work * * * Under the act, even an applicant for employment is an 'employee' with respect to the provisions prohibiting discrimination. See Utah Construction Co., 90 N.L.R.B. 196, 203; Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1272."

■ We agree with the Board's determination in this regard. The men had accepted respondent's offer and were actually working on the pipeline on September 30. On October 1 when respondent assumed responsibility for the operation of the pipeline if they had reported to work, for however brief a period, and then left in protest over the respondent's activities they would clearly be unfair labor practice strikers. However, we perceive no significant reason why a different result should obtain here. On the present record to insist on a requirement that the three men physically report to the job before going on strike would be little more than an empty gesture.

■ Finally, respondent urges that a procedural irregularity infected the proceeding before the Board. It argues that the Trial Examiner committed prejudicial error in denying the respondent opportunity to impeach and attack the credibility of a key Board witness. However, we do not believe that it is now open to us to consider this issue. Respondent filed an extensive list of exceptions to the Intermediate Report of the Trial Examiner with the Board. The point now sought to be urged here was not filed among these exceptions.

Section 102.46 of the Rules and Regulations of the National Labor Relations Board, promulgated under the Labor Management Relations Act provides in pertinent part that:

"EXCEPTIONS TO THE RECORD AND PROCEEDINGS

"Sec. 102.46. *Exceptions or supporting briefs, time for filing; where to file; service on parties, extension of time; effect of failure to include matter in exceptions; oral argu-*

*ments.*—(a) Within 20 days, or within such further period as the Board may allow, from the date of the service of the order transferring the case to the Board, * * * any party may * * * file with the Board in Washington, D. C., seven copies of a statement in writing setting forth exceptions to the intermediate report and recommended order or to any other part of the record or proceedings (including rulings upon all motions or objections), together with seven copies of a brief in support of said exceptions and immediately upon such filing copies shall be served on each of the other parties; and any party may, within the same period, file seven copies of a brief in support of the intermediate report and recommended order. * * *

"(b) *No matter not included in a statement of exceptions may thereafter be urged before the Board, or in any further proceeding.* (Italics ours). * * *"

We believe that this rule sets forth an eminently sound philosophy of orderly administrative and appellate procedure which should be stringently adhered to. Unquestionably it is grounded on the premise that the Board should be alerted by counsel to those errors which may have prejudiced a particular proceeding, and, more significantly, that the Board might assume that counsel only intends to urge those points which are contained in its exceptions. Where this policy is disregarded, and a point not argued before the Board is subsequently urged in a reviewing court, that court is effectively deprived of the deliberations and reasoned analysis of a vital agency whose expertise is always relevant in the quest for the evolution of a sound body of labor law.

Finally, in this court, the respondent attacks the broadness of the Board's order. However, while respondent excepted to the order recommended by the Trial Examiner this exception apparently related more to the sufficiency of the evidence supporting the order than its broadness. As we now find the evidence-

supports the order, we believe that the order must stand. Marshall Field & Co. v. National Labor Relations Board, 318 U.S. 253, 255–256, 63 S.Ct. 585, 87 L.Ed. 744 (1943); see also, Carpenters District Council of Detroit, Etc. v. N. L. R. B., 109 U.S.App.D.C. 209, 285 F.2d 289 (D.C. Cir. 1960).

An order will be entered enforcing the order of the Board.