**NATIONAL LABOR RELATIONS BOARD**
**v. WEIRTON STEEL CO.**

No. 8041.

Circuit Court of Appeals, Third Circuit.
Argued March 15, 1943.

Decided May 4, 1943.

Ruth Weyand, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein and Gerhard P. Van Arkel, Asst. Gen. Counsels, and Winthrop A. Johns, Malcolm A. Hoffmann, and Morris P. Glushien, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

John E. Laughlin, Jr., and Earl F. Reed, both of Pittsburgh, Pa. (Thorp, Bostwick, Reed & Armstrong, of Pittsburgh, Pa., on the brief), for respondent.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

This case presents the now familiar pattern of labor relations in the "Little Steel" industry in 1936 and 1937.[1] The Weirton Steel Company, a Delaware corporation, in June, 1933, without prior consultation with or consent of its employees, installed in its plants what it called the Weirton Steel Employees Representation Plan. The Plan was modeled upon one previously developed by the Bethlehem Steel Company and provided for the election of employee representatives who should be empowered to discuss with representatives of the management matters of concern to the employees. The Plan was wholly financed by the Company and was unquestionably an employer-dominated organization within the meaning of section 8(2) of the National Labor Relations Act, 29 U.S.C.A. § 158(2).

In 1936 representatives of the Steel Workers Organizing Committee came to Weirton to try to organize the employees of the Company and form a local there of the Amalgamated Association of Iron, Steel and Tin Workers of North America. Their presence brought forth a flood of anti-union and pro-plan propaganda and some anti-union coercion of employees, for all of which the Company was largely responsible. The opposition to union organization did not end with words, however, but union organizers and their sympathizers among the employees were followed and in a number of cases brutally beaten by special watchmen of the Company, a number of the latter being employee representatives under the Plan. At this time, in order to implement the Plan, which had no membership or formal organization, the Weirton Steel Employees Security League was formed with the assistance of the Company. It adopted as its program the support of the officers of the Company and of the Plan and vigorous opposition to union organization. Against this opposition the union made little headway.

In April, 1937 after the Supreme Court had upheld the constitutionality of the act the union organizing campaign again became more active. Toward the end of that month a local lodge of the Amalgamated Association of Iron, Steel and Tin Workers was chartered and its officers were elected and became known. Very shortly thereafter a number of the employees who had affiliated with the Union, including its president, vice president, recording secretary and financial secretary, were forcibly evicted during working hours from their posts of duty in the Company's plants by large groups of other employees, including officers and members of the Security League, with the prior knowledge and approval of the Company's supervisory employees. No efforts were made by Company supervisors to prevent these evictions, nor, in spite of protestation by the management that the evicted employees had not been discharged, were 16 of those who had been evicted from the tin mill[2] and one of those who had been evicted from the sheet mill[3] ever able to secure permanent reinstatement.

The facts thus briefly stated were found in full detail by the Board in its opinion. 32 N.L.R.B. 1145. Its findings as to these facts are fully supported by the evidence and, indeed, the Company does not vigorously controvert them. In addition

---

[1] Republic Steel Corp. v. N. L. R. B., 3 Cir., 1939, 107 F.2d 472, modified 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; Roebling Employees Ass'n v. N. L. R. B., 3 Cir., 1941, 120 F.2d 289; Bethlehem Steel Co. v. N. L. R. B., 1941, 74 App.D.C. 52, 120 F.2d 641; N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39.

[2] Cox, Dimitry, Mike Frangakais, Lambros, Homer Marshall, Leonard Marshall, Jr., Moulakis, Nikitas, Paich, Rusus, Silvestros, Snodgrass, Tsouvalos, Wright, Louis Xindas, Steve Xindas.

[3] Mehozonek.

the Board found that the Company had been guilty of labor espionage. This finding was based solely upon the testimony of the vice president of a corporation which had been employed by counsel for the Company to do certain investigating work for it. This witness, who had been called by the Board, stated unqualifiedly that his concern did not furnish to Weirton Steel Company the services of investigators who were to report on the labor activities of employees. The Board based its finding of espionage largely upon the fact that his testimony was evasive and unsatisfactory but we think that this was not sufficient to support the finding, especially in view of the witness' categorical denial of the fact. Accordingly the Board's finding upon this point and the conclusions and portion of the order based thereon must be set aside.

■ Based upon its findings of fact the Board concluded that the Company had violated the National Labor Relations Act and it accordingly ordered the Company to cease and desist from the unfair labor practices found and affirmatively to withdraw all recognition from the Plan and the Security League and its various units as the bargaining representatives of any of its employees and to completely disestablish these organizations as such representatives; to offer reinstatement to the 17 employees evicted from their work, to make them whole for their loss of wages and to post proper notices. We think that the action thus directed was appropriate under the circumstances disclosed by the fact findings and that the Board's order, modified by the deletion of paragraph 1(f) relating to espionage, should be enforced, unless the considerations next to be discussed call for other treatment.

By far the greater portion of the Company's argument is directed, not to the merits of the charges of unfair labor practices, but rather to the proposition that the prejudice and improprieties of the Board and its agents who investigated, prosecuted and heard the proceeding have disqualified the Board from making the order which it here seeks to enforce. At the outset we note that the trial examiner against whom most of the accusations of unfairness are made was superseded long before the end of the hearings and made no intermediate report and that the Board's final decision which was rendered by members against whom no accusations of any kind are made resulted in dismissing 115 cases of alleged discriminatory action by the Company against its employees and in sustaining only 17 such cases. In the light of these facts it becomes difficult for us to avoid the belief that the company's charges of prejudice and unfairness are not advanced on their own merits but rather were devised as a defense to the charges of unfair labor practices as to which no other defense was available. We have nevertheless carefully considered these accusations of unfairness so strongly urged by the Company to defeat enforcement of the order, but we find them to be wholly without merit.

It is true that the hearings got off to a bad start under the administration of a trial examiner whom the Board subsequently withdrew from the case.[4] During this earlier period many thousands of pages of testimony were taken which were wholly irrelevant to the issues and which were subsequently stricken from the record by the second trial examiner whose impartiality and fairness the Company does not question. Many of the rulings of the first trial examiner were unquestionably erroneous but in nearly all cases the erroneous rulings related to matters subsequently eliminated from the record and as to the few remaining instances we are unable to find that the Company was substantially prejudiced by them. When the second trial examiner took charge of the hearings he afforded the Company a full opportunity to offer any evidence which it had previously been prevented from introducing. That it took full advantage of the opportunities for defense which were afforded it is attested by the fact that 16,000 of the 39,000 pages of testimony which were taken in the case represent testimony offered by the·Company.

■ One incident is specially stressed. During the course of the hearings and after repeated warnings the first trial examiner excluded one of the Company's counsel from the case for contemptuous conduct. The counsel thus excluded appealed to the Board from the examiner's ruling and was accorded a hearing by the Board. After

4 The fact that the power and responsibility of making findings of fact and the decisions thereon is entrusted by the Act to the Board and not to the trial examiner and the relatively unimportant part which the trial examiner plays in the scheme of the Act is emphasized in N. L. R. B. v. Botany Worsted Mills, 3 Cir., 1943, 133 F.2d 876, 882.

hearing and considering the circumstances the Board decided that the exclusion was justified and sustained the trial examiner's action. The Board undoubtedly has power in the exercise of its discretion to exclude counsel from hearings conducted by it when they are guilty of contemptuous conduct. We are satisfied that under the circumstances of this case its action was well within the bounds of its discretionary power.

The Company also charges that the attorneys for the Board who investigated and prosecuted the case were guilty of numerous improprieties. These assertions, even if true, are irrelevant since the Board based its decision upon the evidence in the record. Redress for such misconduct upon the part of the Board's prosecuting agents, if it took place, must be provided by the Board in the exercise of its supervisory power over its agents and employees, and not by the courts, unless the misconduct so affected the hearing and decision of the complaints by the Board as to deny the Company due process of law. This necessarily results from the provisions of the statute which combine in the Board the power to investigate, initiate and prosecute as well as to hear and decide complaints of unfair labor practices.[5] We are satisfied that these improprieties if they took place did not prevent the Company from having a fair hearing and decision of its case by the Board. The remaining accusations of unfairness appearing in the record are equally without merit and require no discussion. We conclude that the record does not justify a finding that the Board's decision was reached as a result of bias and prejudice or that the manner in which the hearings were conducted denied the Company due process of law. On the contrary we are left with a strong impression that much of the conduct complained of was deliberately provoked by counsel for the Company, possibly to lay a basis for a defense to charges which otherwise could not be met.[6] Moreover the result of the Company's attack upon the fairness of its hearing if successful would merely be to send the case back for another hearing with its inevitable delay and expense. The Company, however, complains of the length of the previous hearings which extended over 17 months and resulted in a transcript of 39,000 pages of testimony and its attendant expense.

A petition has been filed with us seeking an order directing the taking of additional testimony as to certain matters. These all involve alleged wrongful acts which, the petitioners contend, would tend to establish the bias and prejudice of the Board and its agents and the unfairness of the hearing accorded the Company. Certain of the improper acts are alleged in the petition to have been committed by the first trial examiner and the Board's counsel in the hearings before him. As to these it is sufficient to say that during the period that the first trial examiner presided over the hearings a considerable amount of evidence was presented on behalf of the Company directed to these matters and that the second trial examiner specifically invited the production of testimony concerning "conspiracy and collusion" urging the Company to bring forward any evidence it might possess "to show matters of that kind". Since the Company thus had full opportunity to offer its evidence upon these alleged wrongful acts before the Board, but failed to take advantage of it, the Company is not now entitled to a second opportunity.

In addition the petition for leave to take additional testimony alleges that two former members of the Board, J. Warren Madden and Donald Wakefield Smith, engaged in improper conduct which the petitioners are prepared to establish by proof and which, they aver, would tend to show the bias and prejudice of the Board. The allegations are that a representative of the Union secretly met and conferred with Chairman Madden at his office in Washington for the purpose of discussing "the evidence in the case and the action which the Board might take to further and advance the interests of the S. W. O. C.," and that Mr. Smith attended one of the sessions before the first trial examiner at which he interfered with counsel's "cross-examination of a witness for the Board by directing personal remarks to the respondent's cross-examining counsel and by making annoying noises". Both Chairman Madden and Mr. Smith fully and, in our view satisfactorily, answered these charges. Moreover the terms of office of both had expired before this case was decided. Just

---

[5] Compare Press Co. v. N. L. R. B., 1940, 73 App.D.C. 103, 118 F.2d 937, 940.

[6] Compare N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39, 44, 45.

how their bias, even if it existed, could have affected the actions of Chairman Millis and Messrs. Edwin S. Smith and Leiserson, who were the members participating in the decision of this case, is not explained. We regard the action of the Company in seeking the opportunity to offer evidence with regard to these incidents at this time as little short of frivolous. The petition for an order for the taking of additional testimony will accordingly be denied.

Some question is raised by the Company with regard to the validity of the reinstatement and back pay order entered by the Board with respect to the 17 employees to whom we have referred. In making this order the Board said:

"We have found that the respondent discriminated against the employees named in Appendix 'A' in regard to their hire and tenure and terms and conditions of employment. It appears that the Trial Examiner refused to permit proof that these employees had obtained other regular and substantially equivalent employment. Assuming that they have secured such employment, we find, nevertheless, that in order to effectuate the policies of the Act, it is necessary to, and accordingly we shall, order the respondent to offer to them reinstatement to their former or substantially equivalent positions. The offer of reinstatement shall be without prejudice to their seniority and other rights and privileges."

This direction was within the discretionary power of the Board.[7] We think that the Board's statement that reinstatement is necessary "in order to effectuate the policies of the Act" was a clear indication by the Board that it had exercised the discretion vested in it by the Act as well as a sufficient disclosure of the basis upon which its discretion had been moved. We are not impressed by the Company's contention that it was denied a hearing upon this phase of the order. This determination by the Board was not an ordinary fact finding but rather a highly discretionary exercise by the Board, as an expert agency acting in the public interest, of its judgment as to what action should be taken to neutralize the effect of the Company's unfair labor practices. The Company had a full hearing, lasting many months, before the trial examiners. It also had a hearing before the Board on exceptions to the proposed findings. True, these proposed findings did not include in its present form the matter now under discussion. But the Company was not entitled to a further hearing upon the specific measures of relief after they had been finally selected by the Board.

It is alleged in the answer to the petition for enforcement that the Company voluntarily dissolved on June 2, 1939 and on June 1, 1942 ceased to exist for all purposes except the prosecution and defense of suits and actions begun prior thereto.[8] It is also urged that the decree should not run against the successors and assigns of the Company. As to the first point we think that under the Delaware statute the corporate entity was preserved for the purposes of the proceeding before the Board and that this enforcement proceeding is but a continuation of that one within the contemplation of the statute.[9] With regard to the second point we see good reason under the circumstances why the order should, as is customary, run against the Company's successors and as-

---

[7] Phelps Dodge Corp. v. N. L. R. B., 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L. Ed. 1271, 133 A.L.R. 1217.

[8] Sec. 42 of the General Corporation Law of Delaware, Rev.Code Del.1935, § 2074, as amended by 43 Del.Laws, c. 132, provides: "All corporations, whether they expire by their own limitation, or are otherwise dissolved, shall nevertheless be continued for the term of three years from such expiration or dissolution bodies corporate for the purpose of prosecuting and defending suits by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, and to divide their capital stock but not for the purpose of continuing the business for which said corporation shall have been established; provided, however, that with respect to any action, suit, or proceeding begun or commenced by or against the corporation prior to such expiration or dissolution and with respect to any action, suit or proceeding begun or commenced by or against the corporation within three years after the date of such expiration or dissolution, such corporation shall only for the purpose of such actions, suits or proceedings so begun or commenced be continued bodies corporate beyond said three-year period and until any judgments, orders, or decrees therein shall be fully executed."

[9] Compare N. L. R. B. v. Timken Silent Automatic Co., 2 Cir., 1940, 114 F.2d 449, 450.

signs.[10] It is not suggested that the property has been liquidated or that the business does not continue as an operating unit. Under these conditions the Board may well find that it will effectuate the policies of the Act for the new owners of a continuing manufacturing establishment to rectify the unfair labor practices of former owners of the establishment.

One last point must be noticed. The Board's order directs the posting of a notice that, inter alia, "the respondent's employees are free to become or remain members of the Amalgamated Association of Iron, Steel and Tin Workers of North America, and Steel Workers Organizing Committee". In accordance with the practice heretofore approved by this court [11] this portion of the order will be amended by adding thereto the phrase "or any other labor organization of their choice".

A decree enforcing the order of the National Labor Relations Board as herein modified will be entered when presented in accordance with our Rule 20 (10).

Jose Sabater, of Mayaguez, P. R., and Edward A. Welti, of Brooklyn, N. Y., for appellants.

Oscar Souffront, of Mayaguez, P. R., and Frank Martinez, of San Juan, P. R., for appellees.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

---

[10] See Southport Petroleum Co. v. N. L. R. B., 1942, 315 U.S. 100, 106, 107, 62 S.Ct. 452, 86 L.Ed. 718, especially footnote 6 to the opinion.

[11] See N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39, 51.