## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## GIBBS CORPORATION, Respondent.

### No. 18258.

United States Court of Appeals
Fifth Circuit.

Nov. 22, 1960.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Melvin J. Welles, George B. Du Bois, Jr., Attys., N. L. R. B., Washington, D. C., for petitioner.

Albert S. C. Millar, Jr., Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before RIVES, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for enforcement of a Board order for the reinstatement of an employee whose discharge the Board finds to have been a violation of Section 8(a) (1) of the Labor Act, 29 U.S.C.A. § 158 (a) (1). Charges of violation of Section 8(a) (3) in the firing of the employee were dismissed by the Board, since the Board found the remedy would be the same; that is, the rehiring of the discharged employee with back pay.

It is the position of the general counsel here that the employee, Rodgers, a shop steward of the respondent for the night shift in his department, was fired because of his complaints *on behalf of his co-workers* at a time of very slack employment [1] that in lay-offs the company was

---

1. The record is clear that for several months between November 1957 and April 1958 the number of employees had dropped from some 1100 to between

not carrying out its contractual seniority agreements. Respondent counters by saying that there is insufficient evidence on the record as a whole to permit a finding by the Board that the "griping" and complaining by Rodgers that were admittedly the cause of his discharge were on behalf of anyone other than himself.

The general counsel and the Board recognize that unless the evidence justifies the finding that Rodgers was fired for the purpose of interfering with, restraining or coercing him in the exercise of his rights to engage in "concerted activities" in connection with "collective bargaining or other mutual aid or protection," 29 U.S.C.A. § 157, the Company had an uninhibited right to fire him as an "habitual nuisance."

Here we have a somewhat different case from the usual discriminatory discharge case, for both parties seem to agree that the grounds asserted by the company for firing Rodgers are truly the grounds for his dismissal.[2] In the conversation preceding the delivery of the written statement the company superintendent told the employee he was an "habitual nuisance." The thrust of the Board's position is that the thing that made Rodgers such a nuisance to the respondent was his pleas on behalf of the other employees in his shift for whom he acted as shop steward, and not his repeated demands for preferential treatment for himself.

We have carefully read the record, as we must do when a finding of motive for firing is attacked as not being legally supported, and the following is clear: There is ample evidence from which the Board must have found that Rodgers was

in fact a frequent complainer, not only to his own shop steward and immediate superior, but to others all the way up to the company vice president; he complained several times as to matters that affected him only—transfer from night to day shift, transfer back to night shift, transfer from light work, after an injury, to his old job, failure to get messages calling him to particular work (Rodgers lived 30 miles away and had no telephone and could not always be reached), and a specific complaint on April 4, 1958, that Frank Hethington was working and that he, Rodgers, was not. There is evidence credited by the examiner, although this is denied by several opposing witnesses, that Rodgers did on several occasions, while complaining about violations of seniority rules as to himself, bring up the application of the seniority rules to others on his shift. Some of these complaints were to Gatz, the union president, however, and were not shown to have been communicated to the respondent. There was no evidence of anti-union bias. The employees were, and had been for years, represented by the Independent Workers Union of Florida. Relations were friendly and there is no evidence on the record of any effort by the respondent to interfere with the rights of the union or the employees as protected by the Act other than the one act of firing Rodgers.

The record further discloses that at no time while he was shop steward did Rodgers ever file a written complaint or grievance covering the rights of the employees on his shift under the seniority rules or for any other complaint. It is clear, therefore, that if any concerted action protected by the Act was carried on by Rodgers in his relations with the respondent it was strictly an informal

300 and 400 on account of shortage of shipyard work.

2. Rodgers requested a written statement of the grounds for his discharge. In response he was handed the following letter:

"Dear Mr. Rodgers,

"It is apparent from your attitude that you are not happy working for Gibbs Corporation and are creating an unpleasant problem between our Personnel Office, Supervisory Staff and other rank and file employees; therefore, it is for the good of the company that we are dispensing with your services.

"Very truly yours,
Gibbs Corporation
"(Signed) Rex Dorman
Rex Dorman
Vice President
Industrial Relations."

occurrence and as a part of a protest he was making on his own behalf.

A consideration of the question, then, whether it was the nuisance consisting of Rodgers' repeated complaints about himself or the nuisance consisting of his presentation of the seniority demands of his fellow employees brings this case within the class of many heretofore decided by this Court. The most recent of these is N. L. R. B. v. Redwing Carriers, 5 Cir., 284 F.2d 397. Others pointing out the guiding, legal principles are N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406, and N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567.

Here, as in many other cases, there is conduct of an employee that offers ample ground, if any were needed, for a discharge. Rodgers made repeated requests for special treatment. In order to retain this admittedly competent workman the supervisory employees tried to satisfy him. They shifted him to day shift when he couldn't get along with the night supervisor. Then they shifted him back to the night shift when he complained that he was needed at home during the day. During the year 1957 they put him to work on jobs that produced much more in hourly wages for him than were earned by his own shop steward, Moon. Finally, having complained several times that he should be on the job instead of others with less seniority, he came in and complained that one Frank Hethington, a brother of an assistant foreman and of a vice president of the company, was working when he should have the time. Here is Rodgers' testimony:

"A. I went in and talked to Mr. Moon. I had to get a tool clearance to pick up my check, and I talked to Mr. Moon, and Mr. Hethington, Frank Hethington, was working, and I asked Mr. Moon, I says,—says, 'Mr. Moon, why is he working and he hasn't been here over three years and I've been here six?' and he says, 'I don't know. I have an appointment with Mr. Richardson.'"

The next day Rodgers received a telegram to report to the company. When he got there he was told that he was being fired. When he asked why he was told, "habitual nuisance." Thereafter, he filed a written grievance and attended a meeting between the union president and management in which he was handed a formal discharge letter, footnote 2, supra.

Although Rodgers testified that on several occasions, in talking with his shop steward or foreman, he called attention to the fact that seniority rules were being disregarded as to other employees, the finding of the examiner, we think, pinpoints the exact cause for the discharge. The examiner found: I am convinced that the immediate cause of Rodgers' discharge was his demands to Moon on April 4 that Frank Hethington, an employee with lower seniority was employed while he was not, and the report of this remark to Richardson, and that neither the filing of the charges nor their dismissal touched off his unlawful action against Rodgers." [3]

Not only did the examiner and the Board thus find that the immediate cause of Rodgers' discharge was his complaint to Moon which related solely to a personal gripe of his own, but Rodgers' own testimony completely eliminates any pos-

---

3. Rodgers had filed on February 12, 1958, charges with the Board in which, significantly, he alleged, "Since on or about November 1, 1957, and at all times thereafter Gibbs Corporation * * * had repeatedly laid off W. L. Rodgers *for asking* the Independent Workers Union of Florida *to adjust his complaints* against Gibbs Corporation." (Emphasis added.) These charges were dismissed by the Regional Director on March 31st for "insufficient evidence of violation."

In the instant proceedings, filed May 2nd, Rodgers' action in filing the earlier complaint was the asserted ground for which Rodgers was fired. This was charged as a violation of Section 8(a) (4). This was later amended to include the alleged violations of Section 8(a) (1). The examiner recommended the dismissal of the 8(a) (4) charges and the Board approved this dismissal in these same proceedings.

sibility of a finding that he was fired on account of his activities on behalf of the employees he was authorized to represent.

Rodgers filed a formal complaint about being fired. This written complaint said:

"April 7, 1958

"I was discharged unjust for no reason at all only that I asked for my right to work and could not get any results, and I ask the Labor Board for a hearing which was not granted and then I was called in to get fired.

"W. L. Rodgers"

The filing of this written grievance with the union president resulted in the holding of a meeting on April 8th, which was attended by Rodgers, Moon, Gatz, the union president, and Dorman, vice president in charge of industrial relations. Testifying on the hearing about this meeting Rodgers made it clear that twice during the hearing he said that his only complaint was that *he* was being deprived of *his* seniority rights:

"I said, 'All I ask for is *my* rights to work,' and I said, 'They're working men with less seniority than myself down there as of tonight.' "

and, again,

"And Mr. Gatz told me, he says, 'Now, state your beef.' I says, *'I've got no beef* only what's in that—in that grievance that you've just read' ('I was discharged unjust for no reason at all only *that I asked for my right to work'*) and he says, 'You haven't got any beef?' I said

'Nothing other than that *I need my job.'* "[4]   (Emphasis added.)

Here was the time and place, if such was the fact, for Rodgers to tell the vice president of the respondent, whom he had known for years, that he felt he was being fired because of his activities as shop steward on behalf of his union. He made no suggestion either in his written complaint or in restating his demands or his "beef," that he was being discharged for anything other than his insisting on his own rights. Moreover, his abortive complaint of February with the Labor Board and his initial complaint in this case asserted only grounds personal to him. This is entirely consistent with his own freely repeated testimony that his only complaint about being fired was that he, Rodgers, was being deprived of rights that he claimed.

It is overwhelmingly clear from this record that the company had grounds for discharging Rodgers because of the continued special treatment he demanded.[5] Since, when he undertook *ante litem motam* to state his complaint, he repeatedly stated he was being fired only because he was insisting on his personal seniority rights, and in view of the examiner's finding that the complaint about Hethington's working was the "immediate cause for Rodgers' discharge" we are forced to conclude that the finding that Rodgers was fired on account of his earlier and informal mention of the rights of others is without substantial evidence to support it.

The petition to enforce is Denied.

4. Between these two statements, in response to the leading question asked by general counsel's representative, "Was any mention made of any other men being out of work?," Rodgers testified that he answered:
"A. I told him that—I told him, I says, 'Not only myself, but,' I says, 'there's several of the other men out there on the street that has more seniority than the men that's working tonight, than some of the men that's working tonight.'
"Q. Can you remember anything else that was done? Is that all that was said?

"A. And Mr. Gatz told me, he says, 'Now, state your beef.' I says, 'I've got no beef, only what's in that—in that grievance that you've just read,' and he says, 'You haven't got any beef?' I said, 'Nothing other than that and I need my job.' "

5. This is not to say that he may not have been justified in insisting on his seniority rights. We are not here permitted to pass on that question. But so long as this was action personal to him the company could fire him for such insistence without interfering with his right to engage in "concerted action."