**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SELWYN SHOE MANUFACTURING CORPORATION, Respondent.**

No. 19774.

United States Court of Appeals,
Eighth Circuit.

June 8, 1970.

Michael Messite, Atty., N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., and Leonard M. Wagman, Attys., N.L.R.B., Washington, D. C., on the brief.

Karol A. Korngold, St. Louis, Mo., for respondent.

Before BLACKMUN, GIBSON and LAY, Circuit Judges.

GIBSON, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order issued against Selwyn Shoe Manufacturing Corporation on June 27, 1968, pursuant to § 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 160(e). The Board, in a decision reported at 172 NLRB No. 81, found that the Company violated: (I) § 8(a) (4) and (1) of the Act, 29 U.S.C. § 158(a) (4) and (1), by conditioning the rehire of Evelyn Craig on her withdrawal of unfair labor practice charges filed with the Board against the Company; (II) § 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1), by discharging employee Earlene Reinbold for her vigorous presentation of a grievance; and (III) § 8(a) (3) and (1) of the Act, 29 U.S.C. § 158(a) (3) and (1), by discharging employee Mildred Solter for circulating a petition opposing the recognized union.[1] No jurisdictional issue is presented.

The Board's order requires the Company (1) to cease and desist from the unfair labor practices found; (2) to offer reinstatement to Earlene Reinbold and Mildred Solter to their former or substantially equivalent positions of employment, without prejudice to their seniority or other rights and privileges, and to make them whole for any loss of earnings suffered as a result of the Company's unlawful conduct; and (3) to offer Evelyn Craig employment on a job for which her former employment qualifies her and to make her whole for any loss of earnings suffered since March 27, 1967, as a result of the Company's unlawful conduct.

The Company is an Illinois corporation engaged in the manufacture of women's shoes at its factory in Boonville, Missouri, and has about 300 to 350 employees. United Shoe Workers of America, Local No. 235, AFL–CIO, is the certified bargaining agent for the employees of this factory and has been so for approximately 16 years, including the times when the alleged unfair labor practices took place. We enforce the Board's order on (II) Reinbold and deny enforcement on (I) Craig and (III) Solter.

I

The contract between the Union and the Company provided that during the first 60 days of a new employee's employment, he or she would be considered a probationary or temporary employee and such employment could be terminated by the Company at will and was not subject to grievance procedure. Evelyn Craig was employed less than 60 days when she was discharged on February 9, 1967, because her job had been eliminated for economic reasons. She did not apply for reinstatement or reemployment but on March 3, 1967, she filed charges with the NLRB that she had been dismissed because of her union membership and activities.[2]

1. This cause was heard on a consolidated amended complaint issued against the Company and United Shoe Workers of America, Local 235, AFL–CIO. Originally three separate complaints were filed. The Union was found to be in violation of § 8(b) (1) (A) and (2) by refusing to process Reinbold's grievance. The Union complied with the Board's order so no issue is presented for review in that phase of the case.

2. A violation of § 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1).

In the latter part of March, union President Ruth Minor spoke to Superintendent Mize on another matter. During this conference, Mize allegedly stated to Minor that he felt sorry for Craig and he had a job on which he could use Craig if she would drop the charges she had filed with the Board. On March 27 Minor visited Craig in her home and told her what Mize had said to her. On June 20 Craig filed an amended charge against the Company alleging that she was denied reinstatement because she had filed charges against the Company.[3] Mize denied making the alleged statement but recalled that at a meeting with Minor and union representative Gerald Crane, Crane had suggested Craig be reemployed if she would withdraw her charges, but he (Mize) stated he couldn't get involved in it.

The Board's finding that the Company discriminated against Evelyn Craig because she filed charges under the Act, in violation of § 8(a) (4) and (1) of the Act, is not supported by substantial evidence on the record as a whole. Craig was discharged under the probationary employees clause of the contract because her job was abolished. She had no basis for her original charges and at no time did Craig seek reinstatement or reemployment with the Company. There is no evidence that Mize told Minor to tell Craig she would be rehired if she dropped her charges. Furthermore, the Board has held that it is not reasonable to assume a statement made by an employer to a union representative would be repeated by the union representative to the employee. Norman E. Kopp and Larry K. Evans, etc. and Alton-Wood River Building & Construction Council,

143 NLRB No. 78,63–2 CCH NLRB Dec. 19601, 19602 (1963). Finally, an isolated statement made by an employer to a union representative is not coercive, even though such a statement made directly to the employee might be. NLRB v. Council Manufacturing Corp., 334 F.2d 161, 165 (8th Cir. 1964). At no time did Mize speak to Craig or ask anyone else to do so. We conclude that Mize's alleged statement to Minor was too isolated and too removed to constitute a violation of § 8(a) (4) and (1).

II

Earlene Reinbold was employed by the Company in June, 1964. On February 27, 1967, she was working in the prefitting department when at 10 a. m. she ran out of work. She advised Floorlady Meredith Arnold that she was out of work and asked for more work. Arnold referred Reinbold to Department Foreman Bentley. Reinbold told Bentley she had completed her work but would not "clock out" while employee Ola Mae Schrader, who was her junior in seniority, continued to work on a job she could perform. Bentley called for Superintendent Mize and reported Reinbold's refusal to clock out.

Reinbold repeated her complaint to Mize and there followed a short colloquy between Mize and Reinbold as to who was running the plant. Mize told Reinbold to ring out and go home, but Reinbold again refused to leave while less senior employees worked. Mize then told Reinbold she was fired, which brought the reply from Reinbold that he was a son of a bitch. Reinbold left the plant without clocking out and went to the home of Mildred Solter, the prefit-

---

3. § 8(a) (4) of the Act makes it an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter [of the Act]." 29 U.S.C. § 158(a) (4). An employer's refusal to rehire an employee because he has filed charges or given testimony before the Board violates the "otherwise discriminate" provision of § 8(a) (4). Iowa Beef Packers, Inc. v. NLRB, 331 F.2d 176, 184–185 (8th Cir. 1964); Dubin-Haskell Lining Corp. v. NLRB, 386 F.2d 306, 309 (4th Cir. 1967) (en banc), cert. denied, 393 U.S. 824, 89 S.Ct. 83, 21 L.Ed.2d 95 (1968); Pratt & Whitney Aircraft Division, etc., v. NLRB, 310 F.2d 676 (5th Cir. 1962); NLRB v. Syracuse Stamping Co., 208 F.2d 77, 80 (2d Cir. 1953).

ting department steward, who was absent from work that day. Reinbold and Solter returned to the plant shortly and met with Mize, Foreman Bentley and Minor. This meeting was brief and terminated when Mize told Reinbold she had been dismissed in part because of her uncomplimentary reference to him but mainly because she had left the plant without clocking out.

Before the Board the Company contended that Reinbold was discharged before she left the plant for insubordination, that is, for her refusal to clock out and leave the plant as instructed. However, Mize's testimony indicates that he did not consider Reinbold discharged until she returned with Solter because he stated the grounds for her discharge were the son of a bitch reference and her departure from the plant without clocking out in violation of a company rule.

The Company argues that Reinbold was not following any grievance procedure at the time of her discharge since she was discharged before she brought Solter to the factory, that a discharge for insubordination is a valid discharge, that an employer's action in giving preference to an employee contrary to seniority rule, for allegedly insufficient reason, does not constitute an unfair labor practice where both employees were members of the same union and that a purely personal claim of an employee and his action in pressing such a claim does not constitute concerted activity within the purview of § 7 of the Act and is not protected thereby.

Regardless of whether Reinbold was discharged before she left the plant or upon her return, we think there is substantial evidence to support the Board's finding that the Company discharged Reinbold because she vigorously presented her grievance. We think it is also clear that Reinbold properly invoked the grievance procedure outlined in Article XIII of the collective bargaining agreement when she protested first to Floorlady Arnold and then to Foreman Bent-

ley. Section 2 of Article XIII provides in pertinent part:

"If any controversy, claim, dispute, or grievance arises between * * * the Company and any of its employees covered hereunder, in regard to questions of operation of the factory or the application or construction of any provision of this Agreement, * * * it shall be settled in the following manner, by negotiation:

"(a) It shall first be presented by the aggrieved employee or the Shop Steward to the Foreman of the department involved, within three (3) days from the date of occurrence."

While we are not concerned here with the merit or lack thereof of Reinbold's grievance, it seems clear that she had a contractual right under Article XIII to "construction of any provision of this Agreement," which would of course encompass the "Seniority" provision of Article VII, § 1:

"Layoffs shall be based solely on job seniority. When it becomes necessary to reduce the working force, those laid off shall have the privilege of taking any other job which their seniority will permit."

Was Reinbold's presentation of her personal grievance based on a right granted by the collective bargaining agreement protected by § 7 of the Act, 29 U.S.C. § 157, which provides "[e]mployees shall have the right * * * to engage in * * * concerted activities for the purpose of * * * mutual aid or protection"? We think it was.

The Board posits that the voicing of a grievance connected with one's work or his employer's conduct constitutes "mutual aid or protection," citing NLRB v. New England Tank Industries, Inc., 302 F.2d 273 (1st Cir.), cert. denied, 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962), NLRB v. Halsey W. Taylor Co., 342 F.2d 406, 408 (6th Cir. 1965), and NLRB v. Bowman Transportation, Inc., 314 F.2d 497, 498 (5th Cir. 1963).

The *New England Tank* case is inapposite but the *Bowman Transportation*

case does provide some support for the Board's position. The Court in *Bowman* upheld the Board's finding of a violation of § 8(a) (1) and (3) where the Company discharged an employee for asserting a grievance as to a working condition, but there is no elaboration as to whether the grievance was a personal one or one which applied to other workers.

The *Taylor* case also provides support for the Board's position. In *Taylor* an employee who mentioned to the classifier that one of the foremen was working and thereby stealing work from the other employees in the department was discharged the next day. The Sixth Circuit held that § 7 protects the employee's right to utter his grievance as a matter of concerted activity with other employees for mutual aid. Still, this grievance could be distinguished from that of the instant case in that the employee in *Taylor* was not claiming that he personally should be given more work, but rather that all employees were losing out on overtime work because the foremen were working.

The Company relies heavily on NLRB v. Gibbs Corporation, 284 F.2d 403 (5th Cir. 1960), which touched on this issue. An employee who had repeatedly requested special treatment complained to his shop steward that an employee with lower seniority was employed while he was not. This last personal gripe precipitated the complainant's discharge. In holding that the company had grounds for discharging the complaining employee because of the continued special treatment he demanded for himself, the Fifth Circuit did state, in reference to the employee's insistence on his seniority rights, that "so long as this was action personal to him the company could fire him for such insistence without interfering with his right to engage in 'concerted action.'" *Id.* at 406 n. 5.

While Reinbold did file a grievance under the collective bargaining agreement charging that the Company was assigning Saturday overtime work out of seniority one month before her discharge,

it is not contended that Reinbold was an "habitual nuisance" as was the complainant in *Gibbs*. The footnote in *Gibbs* which seemingly would approve the discharge of any employee who asserts a personal gripe would appear on point except for the critical fact that Reinbold expressed her personal gripe in the manner expressly provided for in § 2, Article XIII of the collective bargaining agreement. *Gibbs* makes no mention of whether the employee was following a contractually prescribed procedure when he made his complaint.

 In our view Reinbold was exercising a protected right to press personal grievances based on the provisions of the collective bargaining agreement. We think it obvious that rights secured by such an agreement, though personal to each employee, are protected rights under § 7 of the Act because the collective bargaining agreement is the result of concerted activities by the employees for their mutual aid and protection. Reinbold's assertions of her legitimate complaint should have been recognized and processed through the accepted grievance procedure. The Company's refusal to recognize her right to submit a grievance led to the uncomplimentary appellation and the understandable personality conflict between the parties. The submission of a grievance based on the collective bargaining agreement cannot be the basis for discharge. To approve Reinbold's discharge would thwart the very purposes of the Act—the promotion of harmony in labor-management relations and the recognition of an individual's right to organize for mutual protection and individual security. We enforce the Board's finding of a § 8(a) (1) violation.

### III

Mildred Solter was hired by the Company in August, 1962. She was the shop steward in the prefitting department where she worked as a skiver. On January 24, 1967, she had been given written warning that she appeared indifferent

to her work and that she stayed away from her work too much. On Friday, March 17, 1967, Solter met employees in the rest room during working hours to solicit signatures to a petition seeking to oust the present union. Approximately 18 or 20 persons signed Solter's petition, all but two or three of which signatures were obtained in the factory during working hours. Mize learned of Solter's petition from employee Clara Horst on the 17th. Horst, after talking to Mize, returned to the rest room and removed her name.

On Monday, March 20, during working hours, three employees left the fitting department and went to the pre-fitting department to Solter's work station, where they erased their names from the petition. Mize had observed this activity and heard one of the employees ask Solter for the petition. After asking the employee what the petition was, Mize told Solter she knew "petitioning" on company time was not allowed. Solter denied "petitioning" on company time and claimed she was merely writing down the case numbers of the shoes on which she was working. Mize then sent for Burks, the union's secretary-treasurer, and announced that Solter was fired for petitioning on company time. Solter repeated her denial to Burks but refused to show Burks the alleged entry of case numbers. Burks asked Solter if she wished to file a grievance but Solter rejected the offer.

The Trial Examiner completely discredited Solter's testimony when she acknowledged that sometime between the original hearing and the reopened hearing she had added material to her steward's notebook.[4] The Trial Examiner found that Solter was discharged because her conduct impinged upon her working time, that she absented herself from her work for a considerable period of time while engaged in soliciting signatures for the petition, and that this activity affected the working time of other employees. The Trial Examiner further found that when Mize sought an explanation from Solter for employees being at her work station and her inattention to her duties, she gave him a dishonest answer. Therefore, in his recommended order, the Trial Examiner ordered the complaint be dismissed as to Solter.

Contrary to the Trial Examiner, the Board found that the Company violated § 8(a) (3) and (1) of the Act by discharging Solter for engaging in protected activity, the forming or organizing of a group of employees in opposition to the recognized union. The Board relied upon the testimony of Horst that Mize knew of Solter's anti-union campaign and spoke hostilely toward it on Friday, March 17, and upon the testimony of Solter's Foreman Bentley that he wasn't aware that Solter was away from her job on the 17th. The Board noted the absence of a valid no-solicitation rule prohibiting the activities which led to Solter's discharge and concluded it was not a sufficient defense to Solter's allegation that her solicitation of signatures on her anti-union petition "impinged upon working time," that there must also be a showing that the discharge flowed from Solter's abdication of her working duties. The Board stressed the fact that the Company neither warned Solter nor took action after her solicitation on Friday, the 17th, but then dismissed Solter on Monday, the 20th, when Solter was approached at her work station and only produced the petition at the request of the three employees.

The Supreme Court in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) held that the Courts of Appeals are not bound by the Board's rejection of the Trial Examiner's findings, but can only overturn the Board's findings if those findings are not supported by substantial evidence on the record as a whole. We conclude, as did the Trial Examiner and the Board, that Solter's testimony must be discredited

4. This incident and the procedural questions which arise from it will be discussed *infra.*

due to her attempt to manufacture evidence by altering her steward's notebook in the interim between the original hearing and the reopened hearing. However, we find that without Solter's testimony there is not substantial evidence to support the Board's finding of a violation. Although Solter did not initiate the petition activity on the 20th, there was no way for Mize to know this from his observations. When Mize asked Solter for an explanation of why the three employees were at her work station, Solter fabricated a makeshift story, thereby failing to take advantage of this opportunity to explain that the loss of working time, while flowing from her petition, had not been initiated by her.

The burden of proving an improper motivation in making a discharge is upon the General Counsel. The Company's general hostility toward the campaign to oust the present union standing alone does not supply an unlawful motivation for a specific discharge for good cause. *See* Kellwood Company, Ottenheimer Bros. Mfg. Div. v. NLRB, 411 F.2d 493, 498 (8th Cir. 1969). General Counsel has not carried its burden of showing that Solter's protected anti-union activities were the motivating cause for her discharge. We think that it was reasonable for Mize to conclude on the facts then known to him that Solter was again interfering with production, not only her own but that of others, as she had done on March 17. The Trial Examiner's finding that there was a justifiable ground for Solter's discharge was adequately supported by substantial evidence, while the Board's attemped rationalization of this discharge lacks substance and is not a proper basis for an unfair labor practice finding. This part of the Board's order is denied enforcement.

### IV

The Company contends that the General Counsel's[5] conduct at the hearing precluded a fair hearing and caused a denial of due process. During the direct examination of Mildred Solter, General Counsel questioned her as to two notebooks which she had at her work station on March 20, 1967. She identified one notebook as her steward's book and the other as containing signatures of employees on her petition. On cross-examination Solter was asked to produce the notebook which contained the signatures. Although two sheets from this notebook containing signatures had been extracted and presented in evidence by General Counsel, the notebook itself had not been placed in evidence. General Counsel stated that the notebook was in his custody and he would not produce it.

A subpoena duces tecum was then issued and served personally upon Solter. After consulting with General Counsel, Solter refused to comply with the subpoena. General Counsel then volunteered that he would produce the two notebooks if he were granted permission to question Solter, prior to any further cross-examination, concerning the two notebooks on the day of her discharge. Thereupon the Trial Examiner directed General Counsel to produce the notebooks for whatever purpose he (the Trial Examiner) deemed fit, but General Counsel refused to produce claiming that it was his privilege to admit or not to admit them into evidence. The Trial Examiner then struck all the evidence and testimony of Solter pertaining to the two notebooks and struck the exhibit containing the two pages of signatures, but he subsequently reversed this ruling.

In response to the Company's post-hearing motion for dismissal of the complaint on the ground that General Counsel's conduct had denied the Company due process, the Trial Examiner issued an Order to Show Cause why, in the absence of an offer in writing by General Counsel to produce Solter and the notebooks and to permit the Company to cross-examine Solter in light of these notebooks, an order should not be entered striking all testimony by Solter con-

---

5. Our reference to General Counsel is to the staff member who acted for the General Counsel in presenting this case.

cerning the events of March 17–20, 1967, and rejecting all exhibits received during such testimony. A copy of the Show Cause Order was mailed to Solter on December 14, 1967. General Counsel subsequently responded that he would produce Solter and the notebooks.

The supplemental hearing began on February 13, 1968, and during examination Solter admitted she had custody of the shop steward notebook after the close of the hearing on September 21, 1967, and that she had made additions thereto, deletions therefrom, and changes therein, but she could not say what they were except she thought they were made after Christmas 1967 (subsequent to the time when she received the Order to Show Cause).

In his Decision the Trial Examiner drew no inferences unfavorable to Solter because of her refusal to honor the subpoena since "she was apparently acting upon the advice of General Counsel." However, he did wholly discredit Solter's testimony because of her attempt to manufacture evidence to support her case. The Trial Examiner recommended that the complaint be dismissed as to Solter on its merits. The Board held otherwise and further that the Company was not prejudiced by the events surrounding the cross-examination of Solter, and that General Counsel's delay in producing the steward's notebook did not taint the entire proceedings and did not warrant dismissal of the consolidated complaint.

The Company contends that the willful, improper and prejudicial conduct of General Counsel, a party to this proceeding, by his interference with the Board's subpoena process, by his instruction to Solter not to produce the subpoenaed data, and by his withholding subpoenaed documentary evidence of the witness which was in his custody, denied the Company a fair hearing and due process and warrants dismissal of the consolidated complaint. Our conclusion that there is not substantial evidence to support the unfair labor practice charges of Craig and Salter does not make this question moot for it is the contention of

the Company that General Counsel's refusal to produce Solter's notebooks so precluded a fair hearing as to taint the entire proceeding (including Reinbold's claim which we have found to be supported by substantial evidence, *supra*).

■ The findings of the Board are of course conclusive when supported by substantial evidence, but this "presupposes a full compliance by the Board with the fundamental requisites of a fair hearing. A party to an administrative proceeding has the right to prove facts showing that the procedure followed renders the order of the administrative agency void." Cupples Company Manufacturers v. NLRB, 103 F.2d 953, 956 (8th Cir. 1939). *See* Ohio Bell Tel. Co. v. Public Utilities Comm. of Ohio, 301 U.S. 292, 304–305, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); Morgan v. United States, 304 U.S. 1, 14–15, 58 S.Ct. 773, 82 L.Ed. 1129 (1938). We are fully cognizant that not all departures from proper procedures justify a reviewing court in setting aside administrative decisions—that material prejudice to the interest of the complaining litigant must clearly appear. NLRB v. Ford Motor Co., 114 F.2d 905, 909 (6th Cir. 1940), cert. denied, 312 U.S. 689, 61 S.Ct. 621, 85 L.Ed. 1126 (1941). Whether General Counsel's refusal to produce Solter's notebooks which were in his possession warrants dismissal of the consolidated complaint depends on whether prejudice has resulted to such an extent as to vitiate the entire proceedings.

The Company's reliance on the Federal Rules of Civil Procedure, particularly rules 37(b) (2) (iii), 41(b) and 45(f), for the proposition that a party's refusal to comply with a subpoena warrants dismissal of the consolidated complaint is not directly in point because we are not dealing with a subpoena issued or enforced by a United States District Court in the instant case. Under § 11(2) of the Act district courts have the jurisdiction to issue orders enforcing subpoenas issued by the Trial Examiner "upon application of the Board," 29 U.S.C. § 161(2), but the Board obviously did

not make such application here. However, while it has been consistently held that the private litigant cannot petition the district court for enforcement of a subpoena issued by the Trial Examiner under § 11(2) of the Act, the question of the General Counsel's refusal to obey the Trial Examiner's subpoena and the Board's refusal to seek enforcement is properly before this court since "the private litigant may review the errors of the Board resulting from the refusal of the Board to petition for enforcement of the subpoena on either a petition to enforce or set aside the Board's final order under Sections 10(e) and 10(f) of the Act (29 U.S.C. § 160(e) and (f))." Wilmot v. Doyle, 403 F.2d 811, 815 (9th Cir. 1968).

In reviewing an order of the NLRB dismissing a complaint charging a company with various unfair labor practices, the Court of Appeals for the District of Columbia recently remanded a case to the Board because it failed to explain why it did not draw unfavorable inferences against the company because of the company's continued refusal to produce records subpoenaed by the Trial Examiner after the company's motion to revoke the subpoena was denied. International Union, United Automobile Aerospace and Agricultural Implement Workers of America (UAW) v. NLRB, 136 U.S.App. D.C. 104, 419 F.2d 686 (1969). In the instant case, the Trial Examiner (and the Board obviously concurred) drew no inferences unfavorable to Solter from her

refusal to produce because she was apparently acting under the advice of the General Counsel. While we are inclined to agree with this factual characterization excusing Solter's initial conduct, we do not think this conclusion resolves the question of prejudice to the Company.

The Board's finding that the Company suffered no prejudice because the shop steward notebook was eventually produced by Solter and the Company cross-examined her about it is unrealistic as the notebook in its unmanufactured condition was no longer in existence.

There is a serious question of whether General Counsel's conduct did undermine the fairness and impartiality of the entire hearing. Certainly the integrity of the fact-finding process was thwarted and this stage of the proceeding degenerated into a game rather than a hearing to ascertain facts. If General Counsel had a legal defense or valid reason for noncompliance with the order to produce the requested notebooks, a motion to revoke the subpoena should have been addressed to the Trial Examiner. 29 C.F.R. § 102.31(b). The General Counsel has responsibilities beyond that of a mere adversary. As a public official he has a duty and obligation to be fair to all parties and not to knowingly suppress relevant evidence.[6]

The suppression of relevant subpoenaed evidence which resulted from General Counsel's refusal to produce appears to have clearly prejudiced the Com-

---

6. Board Rule § 102.44 recognizes this duty and provides sanctions which the Trial Examiner and the Board can invoke:

"Sec. 102.44 *Misconduct at hearing before a trial examiner or the Board; refusal of witness to answer questions.*

—(a) Misconduct at any hearing before a trial examiner or before the Board shall be ground for summary exclusion from the hearing.

"(b) Such misconduct of an aggravated character, when engaged in by an attorney or other representative of a party, shall be ground for suspension or disbarment by the Board from further practice before it after due no-

tice and hearing." 29 C.F.R. § 102.44 (a) and (b).

Contemptuous behavior has been ruled as an appropriate ground for exclusion from an NLRB hearing. NLRB v. Weirton Steel Co., 135 F.2d 494, 496–497 (3d Cir. 1943); Great Lakes Screw Corp. v. NLRB, 409 F.2d 375, 379 (7th Cir. 1969). However, the Seventh Circuit made clear in the *Great Lakes Screw* case that exclusion of counsel for contemptuous conduct is a most unusual and harsh sanction and that this exclusion will be upheld only if there is "a clear showing that such conduct amounted to an obstruction of justice." *Id.* at 381 (footnote omitted).

pany on Solter's complaint. However, the Company's inability to secure Solter's notebooks did not affect the adjudication of the Craig and Reinbold complaints since they arose from factual settings totally unrelated to that of Solter's complaint. While we have reservations as to the propriety of General Counsel's conduct, the record indicates that this incident did not obstruct the Trial Examiner's development of the facts on the other complaints. Consequently, we conclude the Company was not prejudiced with regard to the other complaints and this incident did not vitiate the entire proceeding on the consolidated complaint.

The Board's Order as to II Reinbold is enforced and is denied as to I Craig and III Solter.

LAY, Circuit Judge (concurring).

I fully concur. I add only a word substantiating my concurrence as to part II of Judge Gibson's opinion. I have always shared strong conviction that where an individual employee asserts a right found in a collective bargaining agreement it is reasonable to conclude that he is engaged in "concerted activity" protected under § 7 of the Act. See the historical development of this principle in Illinois Ruan Transport Corp. v. NLRB, 404 F.2d 274, 281, 284–290 (8 Cir. 1968) (dissenting opinion).