**GENERAL TEAMSTERS, CHAUFFEURS AND HELPERS, LOCAL UNION NO. 249, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellant,**

v.

**BILL'S TRUCKING, INC., formerly known as Enick Trucking Inc.**

No. 73–1495.

United States Court of Appeals, Third Circuit.

Argued Nov. 29, 1973.

Decided March 13, 1974.

Frank P. G. Intrieri, Jubelirer, McKay, Pass & Intrieri, Pittsburgh, Pa., for appellant.

Donald T. O'Connor, Randolph & O'Connor, Pittsburgh, Pa., for appellee.

Before ADAMS and ROSENN, Circuit Judges, and SHERIDAN, District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge:

The question to be resolved on this appeal is whether a collective bargaining agreement, entered into between a corporation and a union representing its employees, is necessarily terminated when all of the corporation's capital stock is sold and the new owner then changes the name of the corporation. The district court, relying on NLRB v. Burns Intern. Security Services, Inc.,[1] dismissed the complaint on the ground that the labor agreement was so terminated, and the union has appealed.

Since the district court summarily dismissed the union's complaint,[2] we must view the facts in the light most favorable to the plaintiff union. In 1967,

---

[1]. 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

[2]. The district court treated the motion to dismiss as a motion for summary judgment.

a collective bargaining contract was entered into by the General Teamsters Local Union ("the Union") and Enick Trucking, Inc. ("ETI").[3] That contract, by its terms, was to remain in force for a period that included January 19, 1972.[4] ETI was a motor carrier, and prior to January 18, 1972, all of its issued and outstanding stock was owned by one Walter Enick.

By an agreement of sale dated January 18, 1972, Enick agreed to sell all of his stock in ETI to one William Fiore, for cash. The sale was consummated on that same day, and Fiore thereafter transferred all the ETI stock to Diamond Excavating and Hauling, Inc. Fiore was the sole stockholder of Diamond. On the date Enick sold his ETI stock to Fiore, the only assets of ETI were certificates of public convenience issued by the Pennsylvania Public Utility Commission, several tractors and trailers, and a truck. The agreement of sale provided that all liabilities incurred by ETI prior to the January 18, 1972 closing were to be the responsibility of Enick.

Within 30 days of the sale of ETI stock to Fiore, the name of the corporation was changed to Bill's Trucking, Inc. ("BTI"). BTI has engaged, since the sale, in the businesses of motor carriage, almost the identical business in which ETI was engaged.

The dispute in this case arises from the failure of BTI to retain in its employ nine truck drivers represented by the Union. These drivers had been employed by ETI, and the conditions of their employment were set forth in the collective bargaining contract between the Union and ETI. According to the complaint, the drivers were discharged by BTI on January 19, 1972, the day after the sale of ETI stock to Fiore.[5]

The Union brought a breach of contract action against BTI, availing itself of the jurisdiction conferred by section 301 of the Labor-Management Relations Act ("LMRA").[6] The Union maintained that the collective bargaining contract between it and ETI survived the sale of the ETI stock to Fiore, that BTI thus was bound by that contract, and that the discharge of the nine drivers transgressed the terms of the contract. Accordingly, the Union sought damages for the allegedly wrongful discharge of the drivers.

BTI, besides controverting several of the factual allegations of the complaint, interposed a motion to dismiss. The district court, in dismissing the case, reasoned that since, under its view of *Burns Security Services, supra*, "a successor employer is not bound by the contract between the Union and its predecessor," BTI was not obligated to honor the provisions of a collective bargaining agreement entered into by ETI and the Union. In so holding, the district court appears to have misapprehended the thrust of the *Burns* decision and, per-

---

3. The terms of the agreement were contained in the National Master Freight Agreement and the Local Cartage Supplement Agreement of the Teamsters Joint Council No. 40, Freight Division. Both of these agreements became effective on April 1, 1967.

4. The agreement provided, *inter alia*, that it "shall be binding upon the parties hereto, their successors, administrators, executors and assigns."

5. BTI alleges that it offered employment to the nine drivers, but not under the conditions and terms of the ETI-Union agreement; that this offer was refused; and that, in any event, ETI discharged the nine drivers on January 18, 1972, prior to the sale of ETI stock to Fiore.

6. 29 U.S.C. § 185.

The Union also brought unfair labor practice charges against BTI before the National Labor Relations Board, which dismissed the charges. BTI argues that this fact, together with the holding in *Burns Security Services* should preclude entertainment of this 301 action. This contention is without merit. *Cf.* Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Of even less force is BTI's contention that the Board order entered against ETI, in another Board proceeding brought by the Union should bar any action by the Union against BTI under section 301.

haps, the implications for this case of the labor law doctrine of "successorship."[7] Accordingly, we reverse.

■ Broadly stated, in the law of labor relations the successorship issue deals with the extent to which an employer is obligated to honor the legal relations established between another employer and a union. The question arises in various contexts,[8] and no single formula for its resolution has been developed by the federal courts. The district court, in summarily rejecting the Union's claim, relied exclusively on the Supreme Court's recent treatment of the successorship concept in *Burns Security Services, supra.* As the Supreme Court emphasized,[9] however, the decision in that case was an exceedingly narrow one. The pronouncements laid down in *Burns,* therefore, can hardly be read to settle every successorship problem that may arise.

In *Burns,* Wackenhut, an employer, was under contract to provide security services at an airport. A union, the UPGW was certified as exclusive bargaining agent for the Wackenhut security employees, and negotiated a three-year collective bargaining agreement with Wackenhut. Wackenhut's contract with the airport operator expired shortly thereafter, and, after competitive bidding, Burns Security Services was awarded the security contract by the airport operator. Burns retained 27 of the 42 Wackenhut employees at the airport, but declined to honor the terms of the UPGW collective agreement with respect to the retained employees. In addition, Burns refused to recognize or bargain with the UPGW.

The UPGW filed an unfair labor practice complaint with the Board pursuant to section 8 of the National Labor Relations Act, alleging that Burns was a "successor" to Wackenhut, and that therefore its refusal to honor the terms of the collective agreement, or to recognize and bargain with the Union, constituted unfair labor practices under section 8 of the National Labor Relations Act ("NLRA").[10]

After proceedings before the NLRB and in the court of appeals, the Supreme Court held, first, that Burns *was* obligated to recognize and bargain with the UPGW. This holding was predicated upon the fact that NLRB had certified the bargaining unit as an appropriate one, and the fact that Burns had retained a majority of the old Wackenhut employees.[11]

The Supreme Court then focused upon the other question in dispute: whether Burns "was bound to observe the substantive terms of the collective-bargaining contract that the union had negotiat-

---

7. "Successorship," as a generic term, refers to that matrix of labor law doctrine that is called into play "where the identity of the employer changes after the employees have won officially recognized collective power to press their demands against their prior employer." Slicker, A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach, 57 Minn. L.Rev. 1051 (1973).

8. For example, the issue in any given successorship case may involve, *inter alia*: (1) the survival of the union's status as exclusive bargaining agent of the former employees and the new employer's duty to recognize and bargain with this union; or (2) the power of the National Labor Relations Board to order the new employer to remedy unfair labor practices committed by the prior employer; or (3) the extent to which the new employer may be compelled to arbi-

trate under the former employer's collective bargaining agreement; or (4) the extent to which the new employer is bound by the substantive provision of the collective agreement in effect at the time of succession. See Slicker, *supra,* at 1064. These questions may arise in the context of an unfair labor practice case, of a suit for breach of a labor agreement, or in an action to enforce an NLRB order.

9. Justice White, writing for the majority in *Burns,* noted that "Resolution [of that case] turns to a great extent on the precise facts involved. . . ." 406 U.S. at 274, 92 S.Ct. at 1575.

10. Specifically, the union alleged violations of § 8(a)(1), (2) and (5), 29 U.S.C. § 158(a)(1), (2) and (5).

11. *See* 406 U.S. at 278–279, 92 S.Ct. 1571.

ed with Wackenhut and to which Burns had in no way agreed."[12] The Court, relying principally on the history and evident purpose of section 8(d) of the National Labor Relations Act,[13] held that Burns was *not* bound by the terms of the UPGW-Wackenhut agreement. It stated that:

> "[H]olding either the union or the new employer bound to the substantive terms of an old collective-bargaining contract may result in serious inequities." [14]

■ The district court here seized upon this holding in *Burns,* and magnified it into a sweeping interdiction against the enforcement of labor agreements against any putative "successor" employer. Analysis of the *Burns* opinion convinces us, however, that its significance is largely limited to the particular facts of that case and, in any event, that it is not controlling in the circumstances presented here.

*Burns,* it will be recalled, was an unfair labor practice case, not a suit under section 301 of the LMRA for breach of a labor agreement. The Supreme Court thus grounded its *Burns* decision, at least in part, on the policy voiced in section 8 of the National Labor Relations Act which expressly declines to "compel either party [to a labor negotiation] to agree to a proposal or require the making of a concession."[15] Section 8, of course, governs unfair labor practice proceedings, and thus the result in *Burns* may be viewed as following directly from the explicit statutory policy. The present proceeding, on the other hand, is *not* a section 8 case, and, though the policies embedded in that section may have some residual effect,[16] they would not appear to be *directly* controlling in this breach of contract action.

Moreover, the prior and subsequent employers in *Burns* were, as the Supreme Court noted, entirely unrelated —there was no "succession" to the assets, stock or other corporate aspects of the prior employer. Indeed, even after Burns took over the security operation at the airport, *both* Burns and Wackenhut continued as ongoing enterprises. These factual circumstances further limit the impact of *Burns* on the doctrine of successorship in general.[17]

■ That there is no *absolute* bar to the enforcement of labor agreements against "successor" employers in section 301 actions, such as this, is amply illustrated by the decision in John Wiley and Sons, Inc. v. Livingston.[18]

In *Wiley* a union brought an action pursuant to section 301 to compel arbitration under a collective bargaining agreement executed by a company which the defendant had acquired by merger. The Court, basing its decision in generous part on the strong national policy favoring arbitration,[19] held that, in some circumstances, the terms of a predecessor's labor agreement may be enforced against a successor employer in section 301 actions.[20]

---

12. *Id.* at 282, 92 S.Ct. at 1579.

13. 29 U.S.C. § 158(d).

14. *Id.* at 288, 92 S.Ct. at 1582.

15. *See Burns Security Services, supra,* 406 U.S. at 282–283, 92 S.Ct. at 1579.

16. *See* Slicker, *supra,* at 1099.

17. Justice Rehnquist concurring and dissenting in *Burns,* observed that the majority "studiously avoids using the term 'successorship' . . .," 406 U.S. at 296, 92 S.Ct. at 1586, presumably because the case involved no corporate succession.

18. 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

19. *See* 376 U.S. at 549, 550, 84 S.Ct. 909; Cf. Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974) ; United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1961).

20. 376 U.S. at 548, 84 S.Ct. 909. Though the holding in *Wiley* was necessarily limited to establishing the successor's contractual duty to arbitrate, the case, as a practical matter, implies more. This is manifest from the fact that the very question upon which the successor must, under *Wiley,* submit to arbitration, is the extent to which the *other* terms of the predecessor's contract are binding on the successor. *See Burns Security*

That the ramifications of *Wiley* survive *Burns* cannot be doubted.[21] True, the Court in the latter case found no support in *Wiley* for the proposition that "Burns be treated under the collective-bargaining contract exactly as Wackenhut would have been if it had continued protecting the [airport]." [22] But it was specifically emphasized in *Burns* that "Wiley arose in the context of a § 301 suit to compel arbitration, not in the context of an unfair labor practice proceeding where the Board is expressly limited by the provisions of § 8(d)." [23]

*Burns,* then, cannot be read to foreclose absolutely the imposition upon a successor employer of the contract obligations entered into by its predecessor. The district court apparently thought otherwise, notwithstanding intimation by the *Burns* Court that a contract may survive "in a variety of circumstances involving a merger, stock acquisition, reorganization, or assets purchase. . . ."[24]

The district court's misapprehension of the force of *Burns* led, understandably, to its belief that, regardless of what might be proved at trial, the Union could not enforce against BTI its contract with ETI. Wiley and other cases seem to weigh in favor of remanding this case for a trial to determine first, whether BTI was, in fact, the same corporation with which the Union had a contract or, if not, whether there nonetheless existed such "substantial continuity of identity in the business enterprise" [25] before and after the sale to Fiore that the terms of the contract may appropriately be deemed to have weathered that sale.[26]

The Union's pleadings and affidavits indicate that BTI, far from being a distinct corporate entity, was the "same corporation" as ETI. Were the district court to find, after considering the evidence, that such absolute identity of business enterprise existed, both our national labor law and general corporate law[27]—and perhaps plain common sense

25. John Wiley & Sons, Inc., *supra*, 376 U.S. at 551, 84 S.Ct. at 915.

26. Upon remand, the district court might determine that the facts of this case warrant enforcement against BTI of all, some, or none of the ETI-Union contract provisions. For example, if it is found that that contract was entered into by the Union with the specific understanding that its terms would not be deemed to survive a sale of the controlling interest in the corporation, it should not be enforced against BTI. Another issue of fact to be determined, of course is whether there existed a contract between the Union and ETI prior to the sale, and if so, what its terms were.

27. *Cf.* W. Fletcher, Private Corporations § 7121 (1961 ed).

As a matter of corporate law, it would seem that a corporation cannot unilaterally terminate a labor agreement simply because a change in the capital ownership of the corporation occurs. In the context of federal labor law, however, "[s]tate law may be utilized so far as it is of aid in the development of correct principles or their application in a particular case, . . . but the law which ultimately results is Federal." *John Wiley & Sons, Inc. supra,* 376 U.S. at 548, 84 S.Ct. at 914.

*Services, supra,* 406 U.S. at 285, 92 S.Ct. 1571; Slicker, *supra,* at 1098.

21. *See* Detroit Local Joint Executive Bd. v. Howard Johnson Co. Inc., 482 F.2d 489 (6th Cir. 1973), cert. granted, —— U.S. ——, 94 S.Ct. 1481, 39 L.Ed.2d 570 (1973).

22. 406 U.S. at 285, 92 S.Ct. at 1581.

23. *Id.* It should be noted here that at least one commentator has found the distinction drawn by the *Burns* Court between unfair labor practice cases and section 301 actions less than persuasive. *See* The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 255 (1972). On the other hand, the same commentator points out that, under *Burns* and *Wiley,* "an arbitrator may order enforcement of the predecessor's agreement against the successor employer but . . . the NLRB may not." *Id.* at 256.

24. *Id.* at 291, 92 S.Ct. at 1584. The continuing vitality of *Wiley* is evidenced by the recent decision in Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182, 94 S.Ct. 414, 424, 38 L.Ed.2d 388 (1973) : "We held [in *Wiley*] that the disappearance of the contracting corporation by merger did not necessarily terminate *the rights* of employees guaranteed by the agreement . . . ." (Emphasis added.)

—would require the enforcement against BTI of the Union-ETI contract.[28] Should the district court determine that BTI was *not* the "same" corporation as ETI, the doctrine of successorship, properly applied, may still require the imposition upon BTI of the contract terms.

In Golden State Bottling Co. v. NLRB,[29] decided after *Burns*, the Supreme Court noted that:

> "When a new employer . . . has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations, those employees who have been retained will understandably view their job situations as unaltered." [30]

Likewise, when one person simply purchases all the capital stock of a company with outstanding labor contract obligations, the employees of the purchased company will naturally view *their* "job situations as unaltered."[31] In such a case—where an absolute identity or a "substantial continuity" of the business enterprises exists—those employees, except in unusual circumstances, may well be entitled to the contractual benefits of their pact with the prior employer.

The possible consequences of a contrary view could have disturbing implications. For example, an employer dissatisfied with the terms of a validly negotiated labor agreement might seek to avoid them by a sale of his business to a third party, in effect working a unilateral termination of the employees' contract rights.[32] This Court and other courts, aware of such possibility, have consistently held, in breach of contract cases under section 301, that a finding of "substantial continuity" may warrant the conclusion that a successor is bound by the terms of a prior employer's labor contract.[33]

In United Steelworkers v. Reliance Universal, Inc.,[34] a section 301 action brought by a union, this Court held that a collective bargaining agreement between a union and an employer "remained the basic charter of labor relations," as against a successor employer.[35] The groundwork of the holding in *Reliance* was furnished by the fact that, after the sale of a plant to the successor, the bus-

28. Semantically and analytically, the phrase "substantial continuity of identity" may be taken as inclusive of "absolute identity." Thus, if BTI is found to be the "same" corporation as ETI, there would exist, *ipso facto* a "substantial continuity."

Of course, the fact that a transfer of a corporate entity takes the form of a sale of a controlling stock interest might not, in every case, justify the conclusion that there existed either a "substantial continuity" or an absolute identity as between the pre- and post-sale employers. Thus, for example, if a large diversified corporation acquired from a small corporation the latter's sole asset, for use in a field unrelated to anything the small corporation had engaged in, and the acquisition was effected by a purchase of all the small corporation's stock, there might be reason to conclude that the large corporation was not bound by labor contracts entered into by the acquiree.

29. 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973).

30. *Id.* at 183, 94 S.Ct. at 425.

31. The district court characterized the sale of stock from Enick to Fiore as a sale of assets. In light of the allegations of the complaint, we do not share, at least at this stage of the proceedings, the district court's view of the transaction.

32. Similar to this hypothetical instance are the "alter ego" cases, in which a technical change in employer identity is undertaken in the former employer's attempt to disguise its continuance and so mask an unlawful motive to avoid the commands of the national labor laws. Courts have not been misled by the disguised continuance, and have imposed labor obligations upon the "alter ego" enterprise. *See, e.g.,* NLRB v. Southport Petroleum Co., 315 U.S. 100, 62 S.Ct. 452, 86 L. Ed. 718 (1942) ; NLRB v. Weirton Steel Co., 135 F.2d 494 (3d Cir. 1943).

33. Another possibility is that two merging companies, each under contract with separate unions, will seek to arrange the merger terms in such a way as to squeeze out the more powerful of the two unions, or to avoid the more disadvantageous contract.

34. 335 F.2d 891 (3d Cir. 1964).

35. *Id.* at 895.

iness operation "continued without significant change." Moreover, the Court imposed contractual obligations on the successor in the face of a provision in the agreement of sale that the "Buyer shall not assume any obligation of the . . . seller under any collective bargaining agreement. . . ."[36]

The Ninth Circuit has consistently honored the principle that, in section 301 actions, a substantial continuity of business enterprise may justify the imposition of contract terms upon a successor employer. Thus in Wackenhut Corp. v. Int'l. Union, United Plant Guard Workers,[37] there was enforced against a successor an arbitration provision negotiated by the prior employer, whose business and assets had been purchased by the successor.[38] Likewise, in Teamsters, Chauffeurs, Warehousemen and Helpers v. Billington,[39] another 301 case, the Ninth Circuit held a corporation bound to the labor contract of its predecessor, a sole proprietorship whose assets had been bought by the corporation.

■ These cases, read in the illumination provided by *Wiley, Golden State Bottling,* and the Supreme Court's admonition that *Burns* be construed narrowly, convince us that the district court erred in holding that the Union could not conceivably prove a set of facts that would justify the imposition upon BTI of some or all of ETI's labor obligations. The Union's allegations, taken together, assert facts which, if found at trial to be true, indicate that ETI was in reality the same corporation with which the Union had a contract, or that BTI at least represented a "substantial continuity" of business enterprise from ETI to BTI. These factual circumstances, in a section 301 suit for breach of contract, would be sufficient foundation for a conclusion that the discharged drivers may recover whatever damages the contract terms provide.

■ This is not to suggest, of course, that in every case a successor employer may properly be held to the provisions of his predecessor's labor contract. Thus, for example where a manufacturing company acquires the assets of another company, intending to put them to use in an entirely new enterprise, it might be inappropriate to bind the acquirer to contracts negotiated with unions whose members' skills are of no utility in the new industry. But where, as here alleged, there is a simple purchase of stock, followed only by a change in corporate name and some minor changes in business operations, the policies of our national labor law weigh heavily in favor of a doctrine that preserves intact the employees' bargained-for rights and duties,[40] or at least a portion of them. Moreover, enjoyment of the fruits of the collective bargaining process—a surcease of industrial strife, the unimpeded flow of commerce—should not be made to turn on the wood-

---

36. *Id.* at 893. The non-assumption clause in the Union-ETI contract did not refer specifically to labor obligations.

37. 332 F.2d 954 (9th Cir. 1964).

38. As is alleged in this case, the successor in *Wackenhut* had declined, in the agreement of sale, to assume the obligations of its predecessor.

39. 402 F.2d 510 (9th Cir. 1968).

40. Some evidentiary factors to be considered in determining whether there exists substantial continuity of business enterprise are: (1) geographic continuity, i.e., whether the predecessor and successor are similar in terms of their geographic base of operations, and thus in terms of their employee "markets;" (2) similarity of supervisory personnel; (3) continuity of business operation; (4) similarity of product or service; (5) changes in internal operating methods, i.e., machinery, production methods, inventory, trade name, customers, and methods of financing; (6) form of succession, i.e., whether by sale of stock, assets, incorporation of a partnership, dissolution of a partnership, or merger. The lens through which these evidentiary factors should be scanned is, of course, the perspective of the employees. The basic inquiry is whether the change in the structure of the employing enterprise should be deemed to have significantly altered the employment relationship as perceived by the employees. *See* Slicker, *supra,* at 1054–1063.

en concept that labor contracts are terminated by any change in corporate identity, no matter how slight and insubstantial.

■ Summary judgment under Rule 56, Federal Rules of Civil Procedure, is available only when no genuine issue of material fact remains in a litigation.[41] Here, it remains to be decided whether there existed an identity or continuity of enterprise between ETI and BTI. Such determination may be made only after a hearing to determine the pertinent facts of this case.

Accordingly, the judgment of the district court will be reversed, and the case remanded for treatment consistent with this opinion.

41. *See* 10 Wright and Miller, Federal Practice and Procedure § 2712 (1973); Janek v. Celebrezze, 336 F.2d 828, 834 (3d Cir. 1964).